Orval COOPER, Jr.

v.

**D/S A/S PROGRESS and Marius Nielsen & Son**

v.

**JARKA CORPORATION OF PHILADELPHIA.**

**Civ. A. No. 23329.**

United States District Court
E. D. Pennsylvania.
Oct. 28, 1960.

Avram G. Adler, Philadelphia, Pa., for plaintiff.

T. E. Byrne, Jr., Philadelphia, Pa., for defendants.

George E. Beechwood, Philadelphia, Pa., for third-party defendant.

VAN DUSEN, District Judge.

Post-trial motions are now before the court in this personal injury action brought by a stevedore injured in the early morning (about 3:30 A.M.) of January 17, 1957, when a payloader he was operating in the hold of the S.S. Valborg Nielsen, while taking bulk sugar in its

bucket to the gantry box, turned over on its side. The jury returned a special verdict for plaintiff on the issue of liability [1] and the parties stipulated that "the amount which shall be entered as the gross verdict of the jury is $15,000." [pages 2–3 of March 11 transcript (Document No. 51) and N.T. 1051].

On March 7, 1956, North Atlantic & Gulf Steamship Co. entered into a Time Charter of the S.S. Valborg Nielsen from its Danish owner (D–8). On December 26, 1956, North Atlantic & Gulf Steamship Co., as chartered owner, entered into a Sugar Charter Party with the American Sugar Refining Company (hereinafter called "refining company") as charterer for a voyage to transport 3200 long tons of raw sugar from Cuba to New York, Philadelphia, Baltimore or Boston (D–4). Paragraph 6 of the agreement provided "Stevedore for discharging shall be appointed by the Charterer and * * * vessel will allow to the Charterer for discharging" $2.09 per long ton. In January 1957, refining company had a contract dated June 30, 1954, with Jarka Corporation of Philadelphia, third-party defendant and hereinafter called "Jarka" (D–4), under the terms of which Jarka was engaged, "as an independent contractor, to perform, commencing at such time on or after July 1, 1954 * * * all the duties of a stevedore with respect to the discharge of raw sugar" at your Philadelphia refinery "from all deep-sea vessels as to which you shall have the right to appoint the stevedore" (paragraph 1 of 6/30/54 contract in D–4). Jarka agreed "to perform all the work" under the 6/30/54 contract "in an * * * efficient manner in keeping with the best operating practices * * *" (par. 1). In paragraph 3(d), Jarka agreed to:

"Discharge all of each vessel's sugar cargo from any part of the vessel in which it may be stowed or located, * * *. Bulk sugar shall be so discharged by moving and trimming it into the marine gantry elevators and having it moved thereon to the main sugar conveyor belt on the Refinery pier or by discharging it into such other mechanical bulk sugar discharging equipment as you may provide."

In January 1957, refinery company provided a marine gantry elevator for the discharging of the bulk sugar from the S.S. Valborg Nielsen at its Philadelphia pier.

On March 14, 1960, judgment was entered on the special verdict of the jury in favor of plaintiff and against defendant in the amount of $10,500 and costs (Document No. 45). On March 18, 1960, additional evidence was offered in the third-party action (N.T. 1077 ff.) and an order was entered that the right of indemnity exists in favor of third-party plaintiffs and against third-party defendant and that the former, or either of them, may hereafter have judgment against the latter for any amount they prove has been paid in total or partial

---

[1]. The first three questions of the special verdict were as follows:

"1. Was there a failure of the payloader to be reasonably safe, adequate and fit in its design for use on board this ship on January 17, 1957, in unloading the bulk sugar?

Yes or No   No

"If your answer is 'no', please do not answer a and b. If your answer is 'yes,' will you please answer the following subsections of this question:

"a. Was this a substantial factor in causing the accident?

Yes or No ——

"b. Was this exclusive of:

"(1) The list of the ship?

Yes or No ——

"(2) Unreasonable accumulation and consistency of lumps of sugar?

Yes or No ——

"2. Was any unsafe list of the ship a substantial factor in causing the accident?

"Yes or No   No

"3. Was any unseaworthiness of the ship or negligence of its crew, other than as described in questions 1 and 2 above, a substantial factor in causing the accident?

"Yes or No   Yes"

satisfaction of the March 14, 1960, judgment (N.T. 1094–5).[2] See Smith v. Whitmore, 3 Cir., 1959, 270 F.2d 741, 746.

I. Plaintiff's Motion for Judgment N.O.V. (Document No. 43) and To Alter and Amend Judgment under F.R.Civ.P. 59(e), 28 U.S.C.A. (Document No. 54)

Plaintiff contends that it was reversible error for the trial judge to submit the issue of possible contributory negligence to the jury in the form of the following questions 5 and 6 included in the Special Verdict:

"5. Did any negligence of plaintiff contribute to the accident?

Yes or No     Yes

"6. If your answer to question 5 is 'yes,' in what percentage did plaintiff's negligence contribute to the accident?

30%"[3]

The testimony of the witnesses offered by plaintiff includes evidence from which the jury could have found the plaintiff was contributorily negligent, as indicated below. Since the evidence must be viewed in the light most favorable to the verdict of the jury, these motions must be denied for this reason and those stated below under this heading:

Contention that the testimony of Dr. A. E. Baccini called by third-party defendant presented the only evidence of contributory negligence is rejected.

Plaintiff testified that he had a hard time seeing ahead on either side as he went forward with the bucket rising, since the visibility was very poor (N.T. 170 & 182), and that he started raising the bucket when his payloader started forward toward the gantry box (N.T. 164),[4] even though he saw large lumps of sugar ahead of him (N.T. 289). If this testimony is accepted, the jury could have found the plaintiff contributorily negligent for starting to raise his bucket so far from the gantry box.

Also, there was testimony that, when the arm of the payloader was level with the steering wheel, there was no obstruction to the vision of the driver to the right or to the left (N.T. 121)[5] and that plaintiff had the arm or riding gear holding the bucket a little above the steering wheel when the payloader fell on its side (N.T. 126 & 135). If this was true, the jury could have found the plaintiff contributorily negligent for not looking out to the side of the payloader.

Plaintiff emphasizes this excerpt from the charge (N.T. 1005):

"The only evidence that I can remember right off—and you have got to consider all the evidence, and not just accept my memory; I am just trying to tell you what I remember to point up these questions—is

2. Third-party defendant argued vigorously that judgment should not be entered on the verdict in the third-party action until after full argument on an argument list (N. T. 1065–6), particularly in view of the decision in the King case, infra. Since delay in the entry of judgment on a verdict for plaintiff deprives him of interest and this case had been pending 2½ years, the trial judge concluded that the entry of judgment on the principal action was required under the appellate court decisions interpreting F.R.Civ.P. 58. Cf. Danzig v. Virgin Isle Hotel, Inc., 3 Cir., 1960, 278 F.2d 580. Since multiple appeals would result from entry of the two judgments at different times and the trial judge concluded that the language of the King case, as quoted below at pages 587 and 588 of 188 F.Supp., required

third-party plaintiff's recovery in the third-party action, the judgment was entered on March 18. The difficulties resulting from separate appeals on the main action and third-party action are illustrated in Curtis v. A. Garcia y Cia, 3 Cir., 1959, 272 F.2d 235.

3. The jury's answers to the questions are at N. T. 1029–1030. It is noted that counsel for plaintiff withdrew his objection to the above question 5 prior to the closing arguments to the jury and the charge (N.T. 961).

4. At this point, he was 30 to 40 feet from the gantry box (N. T. 288).

5. Plaintiff stated that he could not look out the side as then he would be hit by the arm holding the bucket (N. T. 182-3).

that Mr. Buccini, the man from Drexel here, said that this is a perfectly visible payloader, you could see in front of you, you could see around to the side, you could look around the side and see what was right in front of the front wheels."

The plaintiff overlooks these points:

A. The trial judge's use of the words "right off," indicating it was only his immediate memory without a review of all the testimony.

B. The above-quoted language within the dashes.

C. The emphasis of the judge throughout the charge that it was the jury's memory of the testimony, not that of the trial judge, which should control.[6]

D. The following statement of the trial judge to counsel on March 3 in the absence of the jury, prior to the closing arguments to the jury (N.T. 961):

> " * * * the plaintiff's testimony that he did not look because it was not worthwhile, alone substantiates the possibility of contributory negligence, and I can think of other factors, too."

Contention that jury should not have been permitted to consider evidence offered by third-party defendant in deciding questions 5 and 6 concerning contributory negligence is rejected.

■ The defendant raised the defense of contributory negligence of plaintiff in its Answer (Document No. 5) filed 10/23/57, and repeated this defense in its pre-trial memorandum (Document No. 9, filed 2/13/59), so that plaintiff had no reason to be surprised by its submission to the jury.[7] F.R.Civ.P. 14 permitted the institution of the third-party action and F.R.Civ.P. 42(a) would have permitted the joinder of the third-party action for trial with the cause of action covered in the Complaint, even if it had been a separate suit, so that the rules clearly permit the trial of both the principal action and the third-party action together. Once a trial is held on several causes of action arising out of an accident, it is in the interest of justice to have the fact finder consider all the evidence concerning the accident, irrespective of what party (cross-claim defendant or third-party defendant) offers it. The language, relied on by plaintiff and used in the summons attached to Exhibit A to F.R.Civ.P. Form 22,[8] is included for use in the event that the plaintiff does file a complaint against the third-

---

6. At N. T. 967, the trial judge said:
"If anything I say during my charge is inconsistent with your memory of the evidence or of what somebody has testified to here, you must disregard what I say and follow your own memory of the evidence. * * *
"It is peculiarly the function of the jury to determine what the testimony was and to give it significance."
Again, in supplementing his charge after suggestions of counsel, the trial judge said (N. T. 1017):
" * * * all through this you must use your memory of the testimony. I, of course, in several places have said, 'This is the testimony I remember on it,' or 'This is the only testimony I remember on it,' and it is not my memory that controls, it is yours, and I want you to understand that in answering these questions."

7. Again, on the first day of the trial, counsel were warned that the issue of contributory negligence was going to be submitted to the jury (N. T. 146-7).

8. "You are hereby summoned and required to serve upon * * * plaintiff's attorney * * * an answer to the complaint of the plaintiff * * *." 5 Federal Practice & Procedure by Barron et al., § 3592 (pocket part), contains this comment on the above-quoted language:

> "The provision in the form of summons now part of Official Form 22 requiring an answer to the complaint of the plaintiff has not been accurate, since the 1948 amendment to Rule 14(a) changed that rule so that the third party is now permitted, but not required, to assert such defenses as he may have against the plaintiff's claim."

See Pearson v. United States v. Young, 15 Fed.Rules Serv. 211, 213, § 14a.114, Case 1 (S.D.Iowa 1950), where the court disregarded the above-quoted language from the form as "obsolete."

party defendant as he is permitted, but not required, to do under the fifth sentence of F.R.Civ.P. 14(a).[9] The fact this language was not eliminated from the form used in this case is of no significance, particularly since plaintiff is not asking for default judgment against third-party defendant.[10]

It is also noted that the trial judge was never requested to instruct the jury that Dr. Baccini's testimony (N.T. 864ff.) should not be considered by the jury on the issue of contributory negligence (N.T. 1010–1016). Plaintiff concedes at page 3 of his April 5 brief that the testimony of Dr. Baccini was relevant and necessary in the third-party action. Under such circumstances, the

plaintiff cannot now complain that Dr. Baccini's testimony was considered by the jury on this issue (see F.R.Civ.P. 51 and 61), even assuming the trial judge was in error in not severing the principal action from the third-party action for purposes of trial.

II. Post-Trial Motions of Original Defendants (Document No. 53)[11] and Motion To Strike Third Interrogatory of Third-Party Defendant (Document No. 55)[12]

In answering Special Question 1, the jury found that the payloader was not an unseaworthy appliance and the answer to Special Question 2 established that the ship was not unseaworthy in any list of the ship. Both defendants and

---

9. "The plaintiff *may* assert any claim against the third-party defendant arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff, * * *." (Emphasis supplied.)

In this case, the plaintiff filed no complaint against the third-party defendant.

10. Pages 4–8 of Plaintiff's Supplemental Trial Brief (Document No. 60) were conceded by plaintiff's counsel to be moot (N. T. 9), since the third-party defendant demanded a jury trial in this action. The case cited at pp. 2–3 of that brief presented to the court a different factual background and legal issue than those involved here. Similarly, the cases cited at the top of page 8 of plaintiff's June 20 brief are not in point. The trial judge's reasons for refusing to sever the principal action and third-party action for purposes of trial are at N. T. 10–13. Plaintiff's contention that the third-party defendant was his adversary on every point (page 12 of his June 20 brief) is negatived by the support. he received from Jarka on his contention as to the ship's list. The partial transcript of May 17 and 18, 1960, in the Lutek case (Civil Action No. 20507) is not sufficient to show whether the third-party defendants in that case were, or were not, taking on some issues the same position as the plaintiff, so that Judge Egan's ruling relied on by counsel for plaintiff in the attached letter dated 9/15/60 (see, also, pages 7 ff. of June 20 brief), may well have been on a different factual situation than that presented by this record. For example, at pp. 12–13 of the partial transcript, Judge Egan indicated

there would be little reason for one of the third-party defendants (Hogan) to have any interest in the principal action. Hogan's counsel indicated some of plaintiff's witnesses were adverse to its position (pp. 13 ff.), but the small part. of the record transcribed makes it impossible to visualize the factual situation before Judge Egan when he made his ruling. It is also noted that Judge Egan's ruling was made more than two months after the trial judge made his allegedly contrary ruling in this case, which plaintiff now seeks to have overruled.

11. Defendants' Motion For Judgment on the Whole Record (Document No. 40½) and their Motion to Strike the Third Interrogatory (Document No. 32) state the same reasons as are in this Motion. See N. T. 1074, where the trial judge stated he would deny these motions if he was required to rule on them prior to the entry of the judgment of March 14 (Document No. 45).

12. Third-Party Defendant's Motion To Strike the Third Interrogatory (Document No. 37) filed before the entry of judgment on March 14 (Document No. 45), states no additional reasons and will be treated in the same way as this Motion. See N. T. 1074, where the trial judge stated he would deny the Motion marked Document No. 37 if he was required to rule on it prior to the entry of the March 14 judgment (Document No. 45). It is not necessary to decide whether third-party defendant has any standing to file such Motions in view of its failure to answer the Complaint, since the points covered by them are raised by defendants' Motions.

third-party defendant object to the third special question, which was worded as follows:

"3. Was any unseaworthiness of the ship or negligence of its crew, other than as described in questions 1 and 2 above, a substantial factor in causing the accident?

Yes or No    Yes"

However, third-party defendant's counsel specifically approved both questions 3 and 4 when they were submitted to him for comment the day before the charge was given (N.T. 959).[13] Defendants' counsel consistently objected to this question 3 (N.T. 956 & 943).

Prior to submitting the written special verdict to the jury, the trial judge had explained in his charge that the doctrine of unseaworthiness required the defendants to provide a safe vessel (N.T. 985 & 986) and that the principle of negligence required the defendants to use reasonable care to provide workers such as plaintiff with a safe place to work (N. T. 988–9).[14] After reading question 3, the trial judge used this language in his charge (N.T. 998–999):

"I have given you specific questions on the two matters that I remember were most described here as being the fault of the shipowner, but if you find there was any other unseaworthiness of some appliance, or there was any negligence that was a substantial factor, of course, that it is not contemplated by the questions 1 and 2; namely, the payloader and the list, then, of course, that also could cause liability.

"My memory is that the only other thing that would be covered by 3 is possibly your finding that under all the circumstances down in that hold there wasn't any exercise of reasonable care by the shipowner to provide the plaintiff with a safe place to work; that even though you found the payloader was a seaworthy appliance, that you found there was no list, that you might find it was unreasonable for them, for example, to have so many rock-like pieces of sugar around. Of course, I do not know how you are going to decide those facts. Certainly conceivably there could have been so many rock-like pieces of sugar around that it was a negligent condition, and if you found that it had been there a long time and that the ship mate in making his rounds should have seen it, you can find there was the failure to exercise reasonable care to provide this plaintiff with a safe place to work."

The evidence justified the jury in finding that the payloader had been taken down into the hold prior to 1:30 A.M. (D-4a) on this very cold January night when there were considerable rock-like, large pieces of sugar in the vicinity of the gantry box [15] and that there was a substantial probability that the wheels of plaintiff's payloader would run over

13. "As far as 3, 4, and 5, and 6 are concerned, those I think in substance are proper. * * *

  *     *     *     *     *

"Mine are only the first and second; the rest of them, so far as I am concerned, can stay the way they are." (N. T. 959).

14. The trial judge continued after explaining this principle by saying (N. T. 989): "Now, the shipowner, you may find—and I think you would find, but it is up to you—does not need to have a man down in each one of these holds all the time. He ought to have somebody walking around on the deck and from time to time observing. How long was it that this condition existed, if you accept the plaintiff's testimony that it did exist, that those payloaders were down there moving around with a lot of rock-like substances in there? Was it unreasonable for the mate not to know the exact conditions that existed at 3:30? You have got to consider this: What do you think a reasonable mate and a reasonable apprentice seaman on duty should have known as to the conditions down in that hold in considering this concept of negligence?"

15. At D-4b, the Discharging Report of Refinery Company states, at 1:30 A.M. on 1/17/57 "the sugar began to harden on account of the cold weather." See, also, P-8.

such pieces in getting the bucket up to that box. The jury could have found that this condition constituted an unreasonable risk of harm to plaintiff and others operating the payloader for a period of at least 1½ hours before 3:30 A.M., when it could have been found that the accident occurred. The liability for failure to exercise reasonable care to provide personnel working on the ship with a safe place to work is firmly established in the appellate court cases. See Brabazon v. Belships Co., 3 Cir., 1953, 202 F.2d 904, 906; Mesle v. Kea Steamship Corporation, 3 Cir., 1958, 260 F.2d 747, 750; cf. West v. United States, 1959, 361 U.S. 118, 123, 80 S.Ct. 189, 4 L.Ed.2d 161.[16]

■ Also, the doctrine of unseaworthiness required the shipowner to supply equipment and devices sufficient to permit the unloading job to be done in reasonable safety, even though this might have required equipment in addition to the payloader, such as other devices or more personnel, to remove the rock-like lumps of sugar.[17] See Mesle v. Kea Steamship Corporation, supra, 260 F.2d at page 751;[18] cf. Grillea v. United States, 2 Cir., 1956, 232 F.2d 919, 922;

Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 548–550, 80 S.Ct. 926, 4 L.Ed.2d 941.[19]

■ Defendants apparently concede that plaintiff's pretrial memorandum gave them notice that plaintiff claimed negligence in failure of defendants to provide a reasonably safe place to work (page 3 of defendants' brief filed June 21), but contend that (a) no warning was given them in the pleadings or pretrial memorandum of a claim of unseaworthiness on the ground as stated in the preceding paragraph, and (b) no warning was given them of a contention that there were rock-like lumps of sugar in the hold. Plaintiff, in his deposition of 2/16/59, had stated that there were hard lumps of sugar in the hold, making the surface uneven (pp. 43–47 of Document No. 24; cf. N.T. 805) and that he had to run the payloader over "uneven sugar, hard lumps on the deck of the ship" (page 47).[20] Also, defendants had available to them many months before trial the statements of witnesses referring to these lumps of sugar in the hold on the night of the accident. [See Statement of John J. Riley taken 6/10/59 (pp.

16. In this case, the court said at page 123 of 361 U.S., at page 193 of 80 S.Ct.: "* * * one aspect of the shipowner's duty to refrain from negligent conduct is embodied in his duty to exercise reasonable care to furnish a safe place to work."

17. Any complaint that this doctrine was not fully explained to the jury is harmless error as far as the ship and Jarka are concerned. See F.R.Civ.P. 51 and 61.

18. The court used this language at page 751 of 260 F.2d: "* * * the shipowner, having knowledge * * * actual or constructive * * * that certain activity will occur, is imposed with an absolute duty of supplying equipment for permitting the conduct and accomplishment in reasonable safety of that activity; liability is imposed for failure to comply with this duty, termed one of making the vessel seaworthy."

19. The court used this language at pages 549–550 of 362 U. S., at page 932 of 80 S.Ct.:

"There is no suggestion in any of the decisions that the duty is less onerous with respect to an unseaworthy condition arising after the vessel leaves her home port, or that the duty is any less with respect to an unseaworthy condition which may be only temporary. * * * the shipowner's actual or constructive knowledge of the unseaworthy condition is not essential to his liability. * * * liability for a temporary unseaworthy condition is (no) different from the liability that attaches when the condition is permanent."
Cf. also, Gindville v. American-Hawaiian Steamship Co., 3 Cir., 1955, 224 F. 2d 746, 747–748.

20. The plaintiff testified at page 47 of Document No. 24:
"Q. How big were these lumps? A. Some time they ranged a foot, some time they ranged a little smaller, and some times larger."

6–9 of D–2) ; Statement of Orval Cooper dated 1/21/57 (3 PD–3).]

Furthermore, there was testimony concerning the presence of these rock-like or hard lumps of sugar during the trial which was not objected to by counsel for defendants.[21] Once this testimony became evidence in the case, there was implied consent to try the issues raised by such evidence and they are to be treated as if raised in the pleadings (see first sentence of F.R.Civ.P. 15(a)).[22]

The jury may well have found that, although the payloader was a seaworthy device to use in unloading bulk sugar with some hard lumps in it, the ship failed to exercise reasonable care in not removing, by other means, prior to operation of the payloader, the many such hard and large lumps which they found were in this hold from 1:30 to 3:30 in the very cold weather on the early morning of January 17, 1957.

For these reasons, the foregoing Motions will be denied.

III.  Motion of Third-Party Defendant To Strike Fourth Interrogatory (Document No. 56),[23] Motion of Third-Party Defendant for Judgment on Whole Record (Document No. 57),[24] and Motion of Original Defendant for Judgment of Indemnity, Costs, Expenses in Defending the Case and Counsel Fee (N.T. 1074)

■ As noted under II above (see reference at footnote 13 and also N.T. 793–4), the third-party defendant specifically stated that he had no objection to question 4 prior to the charge.  However, he made this statement after the charge (N.T. 1016) :

"Your Honor, please, I wish to take exception to each word, each sentence, each paragraph of your charge relative to Question No. 4."

Question 4 and the jury's answer are as follows:

"4.  Did any fault described in question 1 or 3 above which you have answered 'yes' result from any failure of the stevedoring company (third-party defendant, Jarka Corporation of Philadelphia) to perform its obligation to discharge the cargo, including the use of equipment incidental thereto, in a reasonably safe and workmanlike manner?

"Yes or No      Yes"[25]

21.  Notice that this testimony would be produced was contained at page 9 of plaintiff's pre-trial brief of 3/26/60, submitted the first day of the trial.

22.  This paragraph answers contention (a) above.  Plaintiff's pre-trial memorandum (Document No. 8) alleged that the payloaders operated "on the uneven surface of the bulk cargo" (P. 2) and reserved the right "to advance at the trial * * * such other contentions as may be fairly drawn as inferred from the facts advanced" (p. 4).

Also, it is noted that if counsel wish a more definite statement of issues than is contained in their adversaries pre-trial memo, they can move for such a statement at any time.  As soon as defendants knew of the alleged existence of the rock-like lumps of sugar, they were in a position to anticipate that counsel for plaintiff might make the contention stated under (a) at the trial.

23.  Motion to Strike Fourth Interrogatory (Document No. 38) filed before the entry of the judgment of March 18 (N. T. 1094–5) states no reasons in addition to this Motion and will be treated in the same way as this Motion.  At N. T. 1095, the trial judge stated that he would deny this Motion if he had to rule on it prior to the entry of the March 18 judgment.

24.  This Motion supplements a similar motion filed by third-party defendant on March 4, 1960 (Document No. 30) ; see N. T. 1020.

25.  Also, it should be noted that third-party defendant contended during the trial that the disposition of the third-party claim should be by the court as a question of law (N. T. 793 & 798).

The charge concerning this question is at N.T. 1001–1003.[26]

A question substantially similar to the above question 4 was approved in Curtis v. A. Garcia y Cia, 3 Cir., 1959, 272 F.2d 235, 238. Third-party defendant places the principal reliance of its contention that no right of indemnity exists in this case on King v. Waterman Steamship Corp., 3 Cir., 1959, 272 F.2d 823, certiorari granted 1960, 362 U.S. 926, 80 S.Ct. 754, 4 L.Ed.2d 745.[27] However, the court emphasized in the King case, supra, at page 825, "the absence of a contractual relation between the parties * * * bottomed on a promise, express or implied, in fact * * *." The court was careful to point out in footnote 1 " * * * no evidence was introduced concerning this matter" (circumstances under which the stevedoring company did the unloading). The King decision was also careful to distinguish Crumady v. Joachim Hendrik Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413, where the charterer operating the vessel had contracted with the stevedoring company to do the unloading. In this case, the contract under which the stevedoring company unloaded this vessel is in evidence [28] and, among other undertakings, Jarka agreed to "move and trim it into the marine gantry elevator * * * in keeping with the best operating practices."[29] As pointed out above at page 580 of 188 F. Supp., Refining Company, as charterer of this vessel for this voyage under the Sugar Charter Party of December 26, 1956, is a party to this unloading contract, so that the following language from the King decision is pertinent (pages 825–826):

"The evidence showed that the shipowner had chartered the vessel to an operator who had contracted

**26.** This portion of the charge included this language (N. T. 1001–1003):
"Now I want you to look away from your papers and listen to my description of this concept of the duty of the stevedoring company as between the ship and the stevedoring company to perform its work of unloading down there in a reasonably safe and workmanlike manner. The stevedoring company by agreeing to perform stevedoring operations became obligated to the shipowner to perform such operations in a competent, safe and workmanlike manner. In this case that obligation to the shipowner included the duty to discharge the cargo in a reasonably safe manner and to save the shipowner harmless from any results of his failure to discharge the cargo in this reasonably safe manner. This third-party action is brought by the shipowner to recover for this implied warranty of the stevedoring company to unload the cargo in a reasonably safe manner. * * *
"As between the ship and the stevedoring company, the stevedoring company is bound by its obligation to do its work in a reasonably safe, workmanlike manner. On the other hand, the stevedoring company has no duty to indemnify the shipowner for any independent acts of negligence for which you may find the ship responsible. If you find that your answers to 1 and 3 were because of some negligence of the ship as opposed to something that the stevedoring company was doing down there in the hold, then, of course, you would answer this Question 4 'No.'
\* \* \* \* \* \* \*
"As between the shipowner and Jarka, Jarka had undertaken to discharge bulk sugar *by moving and trimming it into the marine gantry elevators*, and if the failure to do this in a safe, workmanlike manner caused the accident, you should answer this question 'Yes,' and the shipowner will recover any liability imposed on him against the stevedore. On the other hand, if you do not find that there was a breach by Jarka of its obligation to discharge the cargo in a reasonably safe and workmanlike manner, then you answer the question 'No.'"
(Italics supplied to indicate words quoted from contract of 6/30/54, as set forth at page 580 of 188 F.Supp. above.)

**27.** N. T. 1022, 1084–1094 & page 4 of brief of 6/24/60.

**28.** Contract of June 30, 1954 in D–4.

**29.** See parts of contract mentioned in preceding footnote referred to at page —— of —— F.Supp. above. Part of this language was incorporated in the charge as italicized in footnote 26 above.

with the stevedoring company to unload the vessel. In these circumstances the Supreme Court ruled that '[t]he warranty [of workmanlike service] which a stevedore owes when he goes aboard a vessel to perform services is plainly for the benefit of the vessel whether the vessel's owners are parties to the contract or not.' 358 U.S. at page 428, 79 S.Ct. at page 448. The court added that the circumstances under consideration suffice 'to bring the vessel into the zone of modern law that recognizes rights in third-party beneficiaries.' Ibid. Thus, the actual holding of the Crumady case seems to be that a contractual undertaking of the stevedore with the operator of a ship, who is not the owner, to unload in a safe and workmanlike manner inures to the ship."

Although there was an intermediate Time Charter intervening between the shipowner and the charterer who had contracted with Jarka to do the unloading, this additional contract is not significant in the light of the above-quoted language used by the Supreme Court of the United States in Crumady v. Joachim Hendrik Fisser, 1959, 358 U.S. 423, 428, 79 S.Ct. 445, 3 L.Ed.2d 413.[30]

For these reasons, the foregoing Motions of Jarka will be denied.[31]

Defendants seek a modification of the order of March 18 (N.T. 1094–105) to include a judgment for reasonable attorneys' fees, their expenses in defending against plaintiff's claim, including costs, as well as the amount paid on account of the dollar sum, with interest, specified in the March 14 judgment (Document No. 45), in view of the answers to the first four special questions establishing no fault of the ship's personnel as between them and the stevedoring company. In view of the conclusion that defendants are entitled to indemnity and the provisions of the June 30, 1954, stevedoring contract (D–4),[32] the order of March 18 will be modified accordingly. Accord, Shannon v. United States, 2 Cir., 1956, 235 F.2d 457, 459; cf. Frommeyer v. L. & R. Construction Co., 3 Cir., 1958, 261 F.2d 879, 69 A.L.R. 2d 1040; A/S J. Ludwig Mowinckels Rederi v. Commercial Steve. Co., 2 Cir., 1958, 256 F.2d 227, 232. But cf. Crumady v. Joachim Hendrik Fisser, D.C.D.N. J.1959, 176 F.Supp. 595.

Counsel may submit an appropriate order in accordance with the foregoing Memorandum Opinion.

30. Also, the fact that Refining Company may not have had as many operating functions with relation to the ship as the charterer in Crumady had is not significant under the wording quoted above in view of the privity of contract existing here and the express obligation imposed on the Charterer, for whom the stevedore was acting, by the 12/26/56 contract to appoint "Stevedore for discharging" (see page 580 of 188 F.Supp. above).

31. The following briefs of counsel have been placed in an envelope marked "Briefs of Counsel" (Documents No. 61–67) in the Clerk's file: (a) Plaintiff's Trial Brief filed 2/26/60; (b) Plaintiff's Brief Contra Defendant's Post Trial Motions filed 6/24/60; (c) Plaintiff's Brief Sur Plaintiff's Post Trial Motion to Strike Interrogatories Relating to Contributory Negligence and Judgment N. O. V. on the Issue of Contributory Negligence filed 4/5/60; (d) Plaintiff's Brief Sur Plaintiff's Post Trial Motions filed 6/20/60; (e) Memorandum on Behalf of Defendant filed 3/3/60; (f) Brief for Defendants Sur Post Trial Motions filed 6/21/60; and (g) Memorandum of Third-Party Defendant filed 6/24/60.

32. In addition to the provisions of this contract referred to, 188 F.Supp. at page 580, above, paragraph 8(c) on page 7 contains this language:
"We [Jarka] shall indemnify and save you [American Sugar Refining Company] harmless against any and all liability and expense (including but not limited to counsel fees and other legal expenses) under or with respect to any and all such claims and/or suits; * * *."