James HAGANS

v.

ELLERMAN & BUCKNALL STEAM-
SHIP COMPANY, Ltd., Appellant,

v.

ATLANTIC & GULF STEVEDORES,
INC.

James HAGANS

v.

ELLERMAN & BUCKNALL STEAM-
SHIP COMPANY, Ltd.

v.

ATLANTIC & GULF STEVEDORES,
INC., Appellant.

Nos. 13881, 13882.

United States Court of Appeals
Third Circuit.

Argued Oct. 4, 1962.

Decided May 17, 1963.

Mark D. Alspach, Philadelphia, Pa. (Krusen Evans & Byrne, Philadelphia, Pa., on the brief), for Ellerman & Bucknall Steamship Co., Ltd., Appellee.

Francis E. Marshall, Philadelphia, Pa., for Atlantic & Gulf Stevedores, Inc.

Milton M. Borowsky, Philadelphia, Pa. (Abraham E. Freedman, Freedman, Landy & Lorry, Philadelphia, Pa., on the brief), for James Hagans.

Before STALEY and FORMAN, Circuit Judges, and LANE, District Judge.

FORMAN, Circuit Judge.

This is a diversity action in which James Hagans (Hagans), a citizen of Pennsylvania, sued Ellerman & Bucknall Steamship Company, Ltd. (Ellerman), a corporation of England, in the United States District Court for the Eastern District of Pennsylvania, alleging that it owned and operated the Steamship "City of London" engaged in foreign commerce; that on July 1, 1957, the vessel was moored at Pier 98, South Wharf, Philadelphia, Pennsylvania; that Atlantic & Gulf Stevedores, Inc. (Atlantic), a corporation of Pennsylvania, was engaged in discharging a cargo of bags of sand from her; that he, Hagans, in the course of his duties as an employee of Atlantic, was working on the pier assisting in the discharge of the said cargo when he was injured by reason of the negligence of Ellerman and the unseaworthy condition of the "City of London" for which he claims damages in excess of the jurisdictional amount.

Ellerman answered Hagans denying liability and filed a third party complaint against Atlantic, claiming indemnity for any award that might be made to Hagans against it.

Trial was had to a jury during which Hagans sought to show that the "City of London" was berthed as set forth in his complaint pursuant to arrangements made by Norton, Lilly & Company, Inc., as agents of Ellerman, for the purpose of discharging a cargo of 571 tons of sand in 11,441 multiple ply paper bags of approximately 100 pounds each. Arrangements were also made by Norton, Lilly & Company, Inc. for a gang of regular longshoremen to discharge the cargo subject to a contract between Ellerman and Atlantic. It consisted of 22 men. Eight worked in the hold of the ship piling approximately 24 bags into each of several canvas slings; three men operated winches elevating the slings out of the hold over the side of the vessel and two men, stationed on the apron of the pier, saw to the deposit of each sling load of bags as it came over the side on to a four wheeled flat truck. Thereupon a man hooked a tow motor to the truck and pulled it into a large warehouse building on the pier. He entered through a door on the south side of the building adjacent to the narrow apron of the pier and proceeded to a point about 100 feet inside the building along its north wall. Here the remaining eight longshoremen were divided into four pairs, a pair to a truck. Working separately, each man of a pair unloaded the sling on a truck by piling the bags of sand on the floor in tiers five bags high. On arrival at the place where the bags were being stacked, the operator of the two motor detached it and picked up an unloaded truck with its empty sling. He returned to the side of the vessel where the empty sling was lowered to the hold and the procedure was repeated.

On July 1, 1957, the day in question, Hagans was one of a pair engaged in unloading the trucks. The operation was commenced at 9:30 a. m. and at about 10:30 a. m., he was in the act of grasping a bag when his foot slipped on sand on the floor, causing his body to twist resulting in an injury to his back.

The cargo of sand for Philadelphia was stowed beneath 300 tons of bagged sand, consigned to New York, and discharged there first. There was testimony that on arrival the Philadelphia cargo was covered with loose sand and that there were many broken bags. In piling the bags in a sling the broken bags were placed on top. Loose sand fell out of the sling load as it was moved, all along the way to the point where the bags were taken from the trucks to be stacked. Here loose sand fell on to the floor from the broken bags and the tops of those that were unbroken. The broken bags were taken from the sling loads and placed on the stacked bags for recoopering.

The issues posed at the trial were submitted to the jury in six interrogatories. The questions and the answers by the jury were as follows:

"1. Was the plaintiff performing a service of the ship in connection with the discharge of cargo

from the S.S. 'City of London' at the time he suffered his injury?

Yes X No

"2. If your answer to No. 1 is yes, answer the following question. If the answer is no, you need not answer any further questions.

"(a) Was the unseaworthiness of the vessel or of the stowage of the cargo a substantial factor in causing the plaintiff's injuries?

Yes X No

"(b) Was the defendant's negligence in failing to furnish plaintiff with a safe place to work a substantial factor in causing his injuries?

Yes X No

"3. If your answer to any part of No. 2 is yes, answer the following question; otherwise, you need not answer any of the remaining questions.

"Was there negligence on the part of the plaintiff which was a contributing factor in causing his injuries?

Yes No X

"4. If your answer to No. 3 is yes, state to what extent expressed in terms of percentage his own negligence contributed to his injuries.

%

"5. State in what amount you assessed the damages suffered by the plaintiff without regard to any percentage for contributory negligence provided in the foregoing question, that is question No. 4.

$12,500 plus medical expenses

"6. If you do not find in favor of the plaintiff as against the defendant, you need not answer the following question:

"(a) Do you find that the Atlantic & Gulf Stevedores, Inc. performed their services in connection with the discharge of the ship's cargo in a reasonably safe and workmanlike manner?

Yes No X

"(b) If your answer is no, was their failure to perform the work in a reasonably safe and workmanlike manner a substantial factor in causing the plaintiff's injuries?

Yes X No "

Judgment was entered in favor of Hagans against Ellerman in the amount of $12,500 plus medical expenses of $573.-65 and in favor of Ellerman against Atlantic in the same amounts. Ellerman filed a motion for judgment notwithstanding the special verdict and for judgment in accordance with the motion it had made for a directed verdict. Ellerman then moved to vacate and set aside the judgment or in the alternative for a new trial.[1]

Atlantic also moved to set aside the jury's findings as to it and for entry of judgment in its favor or in the alternative for a new trial as to the cause of action by Ellerman against it.

The Trial Court gave consideration to motions of both Ellerman and Atlantic in a memorandum,[2] pursuant to which it entered an order denying all of the motions by both parties. Ellerman and Atlantic appealed from the judgments found against each of them.

I

Ellerman first asserts that Hagans's cause of action does not amount to a maritime tort—one arising within the admiralty or maritime jurisdiction. It submits that it is the locality or situs of the "substance and consummation of the wrong which determines whether the matter is a maritime tort. * * *"[3]

1. Ellerman also moved for recovery from Atlantic of its costs, fees and expenses including attorneys' fees incurred in the defense against Hagans upon which the Trial Court deferred decision.

2. Hagans v. Ellerman and Bucknall Steamship Co., 196 F.Supp. 593 (D.C.1961).

3. Ellerman cites, among others, Forgione v. United States, 202 F.2d 249, 252–253.

It argued that this accident occurred a hundred feet away from the vessel in a building on a pier; that the pier is an extension of land beyond the admiralty jurisdiction and that the law of the State of Pennsylvania applies to causes of action arising thereon.[4]

Ellerman complains that the Trial Court erroneously created a brand new concept when it held that Hagans was entitled to recover under the general maritime law because of his status in performing a service to the ship. At best, it contended, "where admiralty and maritime jurisdiction exists and the wrong thus qualifies as a maritime tort, the status of the injured may assume significance in determining his rights under that jurisdiction. But the injured's status never has determined the basic question of whether jurisdiction exists." [5]

Ellerman specifically took issue with the reliance the Trial Court placed on the annotation following Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959), as found in 3 L.Ed.2d 1769, and the answer to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.

"In any such case suit may be brought in rem or in personam according to the principles of law and the rules of practice obtaining in cases where the injury or damage has been done and consummated on navigable water: * * *."

Hagans maintains that the allegedly unsafe condition of the cargo by reason of its improper stowage or negligent manner of discharge constituted an injury to him "caused by the vessel" which, by the wording of the Extension Statute drew his claim into admiralty. Ellerman insists that the act "did not change the basic concept of locality, or situs in determining the extent of the admiralty and maritime jurisdiction in tort cases" and does not bring this case within that jurisdiction because Hagans's injury was not caused by a vessel on navigable water or indeed "by any vessel anywhere". The Trial Court found the determination of these contentions unnecessary and so do we.

The present suit is in the diversity jurisdiction and we must still decide wholly apart from the Extension Act whether Hagans is entitled to the protection of the maritime tort doctrines.

Since the preparation of this opinion and before its filing the Supreme Court has decided in Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 1188, 10 L.Ed.2d 297, that the Extension of Admiralty Jurisdiction Act of 1948 grants maritime jurisdiction in a case wherein "it is alleged that the shipowner commits a tort while or before the ship is being unloaded, and the impact of which is felt ashore at a time and place not remote from the wrongful act." (Footnote omitted.) Gutierrez is discussed infra, at p. 570.

---

(3 Cir., 1953), a decision of this court, as authority for its proposition. In that case merchant seamen sued the United States under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq. for false arrest and imprisonment in a foreign port instituted by a seaman and the captain of their vessel. Such action was held not cognizable under the Jones Act, 46 U.S.C.A. § 688 or under maritime tort law. It is true that a reference was made to situs as being determinative of whether a tort is maritime. However, the statement was made in the context of a fact pattern so different from the allegations of the instant case as to render it irrelevant here. Furthermore, on rehearing, it was noted that the decision in Strika v. Netherlands Ministry of Traffic, 185 F.2d 555 (2 Cir. 1950) involving a personal injury arising out of an unseaworthy condition was different in concept than the case before it. Strika, similar to the case at bar, is discussed infra page 569.

There is no conflict between the consideration of maritime jurisdiction as arising out of the relationship of the shore based worker and vessel in this case and the decision of this court in Weinstein, Executrix, etc. v. Eastern Airlines, Inc., et al. and associated cases, 3 Cir., 316 F.2d 758, in which Forgione is cited with approval.

4. Of course Ellerman argues that under Pennsylvania law Hagans cannot recover against it because the evidence failed to show the breach of any duty owed by Ellerman to Hagans.

5. Hagans and Ellerman also offered opposing arguments here in and in the Trial Court as to the effect of the Extension of Admiralty Jurisdiction Act of 1948, 46 U.S.C. § 740, which provides:

"The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury,

of the jury to Interrogatory No. 1 in applying the general maritime law.[6]

Fundamentally it must be conceded that the Supreme Court has never held a longshoreman not on board a vessel to be within the maritime jurisdiction and thus entitled to the protection afforded by the maritime tort doctrines.[7] However, an analysis of decisions commencing with Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946) leads us to the conclusion that the Trial Court did not err when it held that it is the plaintiff's status, or relationship to the vessel which entitles him to the maritime tort protections.

In Crumady v. The Joachim Hendrik Fisser, supra, 358 U.S. at 426–427, 79 S. Ct. at 447–448, the Court makes concise reference to the decisions reflecting the expansion of the doctrines of seaworthiness for the protection of longshoremen equally with that afforded seamen when performing "the ship's service". It said:

"We held in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 95 [66 S.Ct. 872, 90 L.Ed. 1099] that stevedores, though intermediately employed, are, when performing 'the ship's service,' entitled to the same protection against unseaworthiness which members of the crew doing the same work would receive. And see Pope & Talbot v. Hawn, 346 U.S. 406 [74 S.Ct. 202, 98 L.Ed. 143]. The work of loading and unloading is historically 'the work of the ship's service.' Seas Shipping Co. v. Sieracki, supra, [328 U.S.] at 96 [66 S.Ct. at 878].

"This protection against unseaworthiness imposes a duty which the owner of the vessel cannot delegate. Seas Shipping Co. v. Sieracki, supra, [328 U.S.] at 100 [66 S.Ct. at 880]. Unseaworthiness extends not

---

6. In his memorandum opinion on the post trial motions of Ellerman and Atlantic the Trial Judge said:

"* * * However, it is our opinion that whether or not this plaintiff is entitled to the benefit of the doctrine depends not on the locality of the accident but on what he was doing at the time of the alleged injuries and the character of the work in which he was engaged. In other words, was he in the ship's service? It is stated in 3 L.Ed.2d, in the annotation following Crumady v. The Joachim Hendrik Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413:

"'It is firmly established that, in determining whether one other than a seaman is entitled to benefits of the doctrine of seaworthiness, a single factor is of controlling importance, and this factor is the character of the work done by the person in question. If it is work which is in the "ship's service" * * * then the seaworthiness doctrine is applicable * * * and it has also been held that, assuming that the "ship's service" test is met by the work done by the injured person, it is immaterial to the applicability of the seaworthiness doctrine that the injury was sustained, not aboard this ship but on shore.' 3 L.Ed.2d at p. 1767.

"Having the above theory in mind, the Court submitted to the jury this special interrogatory:

"'1. Was the plaintiff performing a service of the ship in connection with the discharge of the cargo from the S.S. City of London at the time he suffered his injury?'

"We have carefully examined the testimony and our charge explaining that interrogatory and find, first, that there was ample evidence to support a finding that plaintiff Hagans was performing a part of the ship's service and, second, that the jury was adequately instructed on what constituted 'ship's service.'" Hagans v. Ellerman and Bucknall Steamship Co., 196 F.Supp. 593, 594–595 (1961).

7. In fact the Court specifically declined to consider whether the maritime rights of non-crew members created in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 99, n. 17, 66 S.Ct. 872, 90 L.Ed. 1099, should be extended to longshoremen working ashore.

After the preparation of this opinion and prior to its filing the Supreme Court held that the "duty to provide a seaworthy ship and gear * * * applies to longshoremen unloading the ship whether they are standing aboard ship or on the pier." Gutierrez v. Waterman S.S. Corp., supra note 5, 373 U.S. at 215, 83 S.Ct. at 1191.

only to the vessel but to the crew (Boudoin v. Lykes Bros. Steamship Co., 348 U.S. 336 [75 S.Ct. 382, 99 L.Ed. 354]) and to appliances that are appurtenant to the ship. Mahnich v. Southern S.S. Co., 321 U.S. 96 [64 S.Ct. 455, 88 L.Ed. 561.] And as to appliances the duty of the shipowner does not end with supplying them; he must keep them in order. Id., [321 U.S.] at 104 [64 S.Ct. at 459]; The Osceola, 189 U.S. 158, 175 [23 S.Ct. 483, 47 L.Ed. 760]. The shipowner is not relieved of these responsibilities by turning control of the loading or unloading of the ship over to a stevedoring company. It was held in Grillea v. United States [2 Cir.], 232 F.2d 919, that stevedores themselves could render a ship *pro tanto* unseaworthy and make the vessel owner liable for injuries to one of them. And see Rogers v. United States Lines, 347 U.S. 984 [74 S.Ct. 849, 98 L.Ed. 1120]; Alaska S.S. Co. v. Petterson, 347 U.S. 396 [74 S.Ct. 601, 98 L.Ed. 798]. * * *"

The decision in Sieracki to extend the absolute liability protection of the unseaworthiness doctrine was based upon the consideration that the stevedore was "in short, a seaman because he is doing a seaman's work and incurring a seaman's hazards," and he should be entitled to the protection of doctrines "[D]erived from and shaped to meet the hazards which performing the service imposes * * *." The concept that one engaged in the "service of the ship" is entitled to the same protection as a seaman was restated in Pope & Talbot v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953). That case involved a carpenter injured aboard a vessel when there to repair a grain spreader utilized in loading a cargo of grain, and the Court in describing the breadth of the Sieracki decision as applied to Hawn said: "Sieracki's legal protection was not based on the name 'stevedore' but on the *type of work he did and its relationship to the ship.*" (Emphasis added.) 346 U.S. at

412–413, 74 S.Ct. at 207. Six years later in a case involving the employee of a specialist subcontractor injured while aboard the vessel cleaning the ship's generators with carbon tetrachloride the Court held he was not entitled to the protection of the absolute liability maritime tort doctrine *only* because he was not performing traditional ship's crew work. United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki, 358 U.S. 613, 617–618, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959).

In Strika v. Netherlands Ministry of Traffic, 185 F.2d 555 (2 Cir. 1950), cert. den. 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343, a longshoreman injured by reason of the unseaworthiness of the ship's gear, while ashore, was nevertheless held to have an action cognizable under the maritime law. In reaching such a conclusion the Court of Appeals of the Second Circuit stated:

"* * * [T]he defendant argues that since an action upon such an implied warranty is only a tort, the maritime law can have no jurisdiction over a breach of it occurring upon land; that being, of course, an accepted constitutional limitation upon maritime law. We should have found this a serious obstacle, were it not for O'Donnell v. Great Lakes Dredge & Dock Co., supra, [318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596] and the *ratio decidendi* of Swanson v. Marra Brothers, Inc., supra; [328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045] but those decisions appear to us to settle it that such a tort, arising as it does out of a maritime 'status' or 'relation', is cognizable by the maritime law whether it arises on sea or on land. For it seems to us to follow, if Congress has power to impose liabilities in favor of seamen for lapses of care on shore, that Congress at least would have power to impose a similar liability when the lapse is in furnishing a seaworthy ship. It is true that Congress has not intervened as to seaworthiness; yet there is no more

reason to circumscribe more narrowly the duty, which The Osceola, supra, [189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760] established as part of the maritime law, than the Constitution circumscribes the power of Congress, for both in the end are based upon the same provision. [Article III, § 2] Moreover, we find confirmation for this in the 'obligation' of 'maintenance and cure' of a seaman injured on shore, for that is concededly quite as entirely the creature of the maritime law as the 'obligation' to furnish a seaworthy ship. For these reasons, although we have been unable to find a decision holding that a seaman, injured ashore by unseaworthy ship's gear, can recover, we have no doubt that he could; and, if a seaman can, we see no reason to question the ability of a longshoreman also to recover, for that follows from the reasoning of Seas Shipping Co. v. Sieracki, supra, [328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099] especially when it is read with the opinion in Swanson v. Marra Brothers, Inc., supra, [328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045] Public Law 695 of June 19, 1948, 46 U.S.C.A. § 740, has now probably laid all such doubts, but we think that it was not necessary in order to support a recovery in this particular situation." (Footnote numbers omitted.) 185 F.2d at 558. See also Robillard v. A. L. Burbank & Co., Ltd., 186 F.Supp. 193 (S.D.N.Y. 1960).

Ellerman, however, contends that the foregoing cases are inapposite to the instant one for the reason that each either involves a longshoreman injured aboard the ship or, if ashore, the injury was caused by the gear, equipment or appliance on or attached to the ship.

Ellerman also points to two cases recently decided in which shore based workers were held not to be entitled to

recover for unseaworthiness. The first is Partenweederei, M.S. Belgrano v. Weigel, 299 F.2d 897 (9 Cir. 1962) cert. den. 371 U.S. 830, 83 S.Ct. 49, 9 L.Ed.2d 67 (1962). In this case the libellant, an employee of a stevedore, was operating a tractor pulling a railroad car loaded with lumber along the track on a pier to a point where the lumber could be reached by the ship's gear. He was struck by one of the ship's booms which fell because of a defective appliance. After noting that "liability arises not from the place of injury but from the nature of the work being performed." (299 F.2d at 902), the Court of Appeals of the Ninth Circuit held that he had not sustained his burden of showing that the nature of the work performed by him was of the type traditionally performed by seamen. It found that his work was solely on the dock in a preliminary operation separated from the work of loading lumber on the vessel.

In the second case, Waterman S.S. Corp. v. Gutierrez, 301 F.2d 415 (1 Cir. 1962), cert. granted 371 U.S. 810, 83 S. Ct. 40, 9 L.Ed.2d 53 (1962) [8] the Court of Appeals of the First Circuit had before it circumstances involving a longshoreman at work on a pier engaged in unloading bags of beans from the vessel. He slipped on the apron of the pier, due to beans that had spilled and sustained injuries. Concededly the basic facts bear a similarity to those in the case at bar. The Court of Appeals held that the District Court, 193 F.Supp. 984, erred in overruling a defense of laches; that there was no proof of unseaworthiness and that if, indeed, there was unseaworthiness, there had been a failure of proof connecting it with libellant's injury. It was further held, among other things, that the libellant was only in the ship's service in the broadest sense and that he was not entitled to the protection of the absolute liability doctrine of unseaworthiness since the dangers to which the libellant was subject were not the same as the

8. Subsequent to the preparation of this opinion and prior to its filing the Supreme Court reversed this case. Gutierrez v. Waterman S.S. Corp., supra note 5.

risks of seamen and that the hazard resulting in the libellant's injury was the same as that to which a warehouse worker would be exposed.[9]

██ Undeniably Hagans asks for an extension of the protection of the doctrine of unseaworthiness by one step further than it has been granted as yet. We think Hagans is entitled to the step if he has demonstrated that he was in the service of the ship, to a determination of which we now come.

## II

██ Ellerman contends that the jury's affirmative answer to Interrogatory No. 1, finding Hagans in the ship's service, was one virtually directed by an erroneous charge.[10] We need not consider this contention because it is quite clear that as a matter of law "the work of loading and unloading is the work of the ship's service, performed until recent times by members of the crew." Seas Shipping Co. v. Sieracki, supra, 328 U.S. at 96, 66 S.Ct. at 878. Hagans was unloading the vessel, notwithstanding Ellerman's characterization of the job being performed by him as one of merely stacking the bags for transshipment. There is no conflict as to the actual facts. Hagans was one of a twenty-two man gang engaged to discharge the No. 4 hold of the "City of London". He was unloading bags of sand from the motor towed

trucks and placing them in their first immobile resting place ashore. They were the same bags handled by his fellow longshoremen who had started the process of discharge of the cargo in the hold of the vessel. The pier apron could not contain the large number of bags which, in any event, had to be protected from the weather, by being placed within the pier building. The conclusion is inescapable that Hagans performed an integral part of the unloading of the vessel and thus as a matter of law he was in the ship's service.

Nor is Ellerman entitled to the comfort it claims from the decisions in Partenweederei and Gutierrez. In Partenweederei the essence of the Court's ruling was that the libellant had failed to sustain his burden of proving that he was performing the type of work traditionally done by seamen so as to bring himself into the classification of being in the service of the ship. In this case the demonstrated facts disclose that as a matter of law Hagans was in the service of the "City of London".

We have pointed out that in Gutierrez basically the decision of the court revolved around three points: (1) a valid laches defense, (2) lack of unseaworthiness and (3) lack of causal connection between unseaworthiness, if any, and the injury. If the portion of the opinion quoted in the margin[11] holds that a

9. The decision of the District Court in the case at bar, Hagans v. Ellerman & Bucknall Steamship Co., 196 F.Supp. 593 (1961) was noted with disapproval.

10. In its brief Ellerman argued:
"It will be seen that, at the outset, the jury was charged as a matter of law that this is 'an admiralty action' to be decided under 'maritime law' (247a). Ellerman excepted to this statement (267a). The jury was further instructed, in the language contained in Hagans' point No. 3 (248a; 275a), to which Ellerman excepted (238a; 267a), that 'longshoremen who perform the work which is necessarily involved in loading the vessel and discharging its cargo are as indispensable to the ship * * * as are the members of her crew'; and that for this reason 'the work which longshoremen perform

in that connection is regarded as being in the ship's service. * * *"
"Under the above instructions the jury could have made no other answer to interrogatory No. 1 except to find that Hagans was 'performing a service of the ship'. Having been instructed, in accordance with Hagans' request, that longshoremen are regarded as being in the ship's service, any other answer would have been flatly contrary to the charge." pp. 15–16.

11. "There remains the finding of unseaworthiness of the cargo. One speaks of unseaworthy cargo really in terms of result: rather, it is the unsafe condition, created by the cargo, which is felt to be a violation of some absolute duty of the shipowner. We recognize, of course, that a shipowner's duty is not to be evaded

longshoreman while on shore engaged in the process of unloading a vessel is not to be classified as in the service of the ship, we must respectfully disagree with such determination.[11a]

### III

■ Ellerman contends that there was no evidence to support the affirmative answer of the jury to Interrogatory 2(a): "Was the unseaworthiness of the vessel or of the stowage of the cargo a substantial factor in causing the plaintiff's injuries?" The interrogatory was imprecise in posing unseaworthiness of the vessel and unseaworthiness of the stowage in the alternative. Improper stowage is not a distinct tort. It is only one of several different reasons for which a vessel may be unseaworthy. In Morales v. City of Galveston, 370 U.S. 165, 170–171, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962) the Court said:

> "A vessel's unseaworthiness might arise from any number of individualized circumstances. Her gear might be defective, her appurtenances in disrepair, her crew unfit. The method of loading her cargo, or the manner of its stowage, might be improper. Mahnich v. Southern S.S. Co., 321 U.S. 96 [64 S. Ct. 455, 88 L.Ed. 561]; Seas Shipping Co. v. Sieracki, 328 U.S. 85 [66 S.Ct. 872, 90 L.Ed. 1099]; Pope &. Talbot, Inc., v. Hawn, 346 U.S. 406; [74 S.Ct. 202, 98 L.Ed. 143]; Alaska Steamship Co. v. Petterson, 347 U.S. 396 [74 S.Ct. 601, 98 L.Ed. 798]; Rogers v. United States Lines, 347 U.S. 984 [74 S.Ct. 849, 98 L.Ed. 1120]; Boudoin v. Lykes Bros. S.S. Co., 348 U.S. 336 [75 S.Ct. 382, 99 L.Ed. 354]; Crumady v. The J. H. Fisser, 358 U.S. 423 [79 S.Ct. 445, 3 L.Ed.2d 413]; Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355 [82 S.Ct. 780, 7 L.Ed.2d 798]. For any or all of these reasons, or others, a vessel might not be reasonably fit for her intended service. * * *"

However, it cannot be said that the jury was confused by the form of Interrogatory 2(a) because the Trial Court's charge [12] centered around improper stow-

---

by calling a man a longshoreman and placing him in someone else's employ. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. But while labels cannot avoid liability, they should not be used to create it. This is not a case of a defective piece of ship's equipment, or of a dangerous condition aboard the ship. Nor is it a case of a claimant whose work carries him both on and off the vessel. At best, lading, which was not part of the ship, which did not make the ship unsafe, and which had left the ship, is being used to impose absolute liability upon the shipowner for a condition caused by the lading to a shore worker. Some may feel this gangway has been crossed. See, e. g., Hagans v. Ellerman & Bucknall S.S. Co., D.C.E.D.Pa., 1961, 196 F.Supp. 593; Fitzmaurice v. Calmar S.S. Corp., D.C. E.D.Pa., 1961, 198 F.Supp. 304. But it seems to us to extend such protection disregards the whole origin and purpose of the doctrine of unseaworthiness. True, such a worker may be broadly argued to be in the service of the ship. But not even in a technical sense was he on or about to go 'on a voyage.' Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 413, 74 S.Ct. 202, 98 L.Ed. 143. His dangers were not the same. Ibid. We see no difference to a land employee in source, cause, risk, or effect between beans spilled on a dock, or on a trucking platform, or on a warehouse floor in Denver. The very fact that unseaworthiness obligations are 'awesome,' Kent v. Shell Oil Co., 5 Cir., 1961, 286 F.2d 746, 752, suggests that they should not be handled with prodigality. We are unwilling to recognize one here." (Footnote omitted.) 301 F.2d at 416–417.

11a. See note 8, supra.

12. "One of the duties imposed upon the shipowner under the maritime law is the obligation to see that the cargo is safely stowed so as not to create any undue risk of harm to those who are called upon to handle it in the service of the vessel. If the shipowner fails in this duty, the vessel is considered to be unseaworthy with respect to such cargo. Considering all of the facts in this case, it is for you to determine whether or not the shipowner in this instance breached this duty. This duty is an absolute one and does not depend on the exercise of reasonable care. If, as a matter of fact, the stowage of

age as a reason to find unseaworthiness of the vessel and then pointed out other reasons why a ship may be found unseaworthy.

Viewing the evidence in the light most favorable to Hagans, as we must at this stage, there was testimony that the sand bags destined to Philadelphia had been loaded underneath a consignment of bags discharged in the Port of New York; that this cargo contained an unusual number of broken bags; that an excessive amount of loose sand and dunnage lay on the surface and sand sifted through the cargo; that this sand was present in substantial amounts before the unloading of the Philadelphia cargo; and that it was leaking from broken bags, and from crevasses in the bags which had caught the sand, continuously from the time they were placed in the slings until they had traversed the area from the hold to where they were finally stacked by Hagans and the other seven men.

the cargo created an undue risk of harm to the longshoremen, in this case to Mr. Hagans, that fact alone would impose liability on the shipowner if you should find that as a consequence of that the plaintiff was injured.

"Now, to elaborate on that, you will consider the evidence submitted to you as to the manner in which the cargo was stowed on this ship. If you are of the opinion that cargo was not stowed in a safe and reasonable manner, and if you feel further that because that cargo was not properly stowed there was a direct causal relation (372) (27) between that and the subsequent injury to Mr. Hagans, then under those facts the ship would be considered unseaworthy, and if there is a connection between that and his injuries, then you could permit him to recover.

"In further consideration of that situation, for example, if in this case the shipowner was not aware of the fact that certain of the paper bags of sand were broken, and despite that fact stowed bags to be discharged in New York on top of bags to be discharged in Philadelphia, and that by reason of that fact the cargo to be discharged in Philadelphia was rendered unsafe to handle, the shipowner would be responsible to any of the longshoremen who were injured as a proximate result of that fact, even though

From these facts the jury could logically have inferred that the condition of the stow created an undue risk to those called upon to handle it, making the vessel unseaworthy, and that this unseaworthiness was the cause of Hagans's injury. Whether it was the stowage of the New York lading above the cargo to be discharged in Philadelphia or the removal of the New York cargo, which caused the unseaworthiness is, of course, not pertinent. A vessel is responsible for an unseaworthy condition without fault.

In Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954) the vessel was found unseaworthy by reason of faulty equipment brought on board by the stevedore company, an independent contractor. See also Robillard v. A. L. Burbank & Co., Ltd., supra, in which the vessel was held responsible for an unseaworthy condition created by Robillard's fellow workers in the course of unloading a deck cargo of lumber, and

the shipowner did not appreciate the weakness of the bags and the probable damage that would result thereto when the cargo was stowed aboard the vessel.

"However, here we are only interested in Mr. Hagans so that these things I am telling you must relate between this situation on board the ship and what ultimately happened to him, if in fact it happened as he says it did.

"Furthermore, the shipowner warrants to the longshoremen engaged in the ship's service that all of the equipment and appliances used to discharge the cargo are (373) (28) safe and seaworthy and reasonably fit for the purpose for which they are intended to be used. This applies not only to the ship's equipment, such as winches, booms and cables, but also to the equipment furnished by the stevedores, the theory being that the equipment furnished by the stevedores for this purpose is adopted by the vessel as if it were its own.

"Now, I will say there that that is a correct expression of the law, but I personally recall no evidence in this case in which anyone has made any complaint about the equipment that was used. So if that is your recollection of the evidence, of course, that responsibility is of no interest in this case."

Holley v. The Manfred Stansfield, 186 F.Supp. 212 (E.D.Va.1960) in which the plaintiff's decedent himself created the unseaworthy condition by permitting an overhang to form while unloading a cargo of solidified potash for which the vessel was also held responsible without fault.

There may be other theories of the causation of Hagans's injuries. O course the search for more likely explanations is not the function of our review; it is not for us to "redetermine facts found by the jury * * *." Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 359, 82 S.Ct. 780, 783 (1962). Hence we cannot agree with Ellerman's assertion that the jury's conclusion, in answer to Interrogatory 2(a), is without basis in the record.

However, Ellerman further urges that the jury's conclusion in answer to Interrogatory 2(a), in any event, may not stand because the Trial Court erred in admitting hearsay opinion testimony.

Ellerman founds its contention in this respect on the following: During the course of the trial Hagans called as a witness John Nickerson, manager of Norton, Lilly & Company, Inc., Ellerman's local agent. At the request of Hagans he produced a copy of a survey report made for Ellerman at the direction of Norton, Lilly & Company, Inc. of the condition of the cargo holds of the "City of London" at the time of its arrival and before the discharge of the cargo. Over objections of Ellerman the Trial Court permitted the witness to read excerpts from a copy of the survey relating to the cargo of sand in the No. 4 lower hold on the theory that the survey was a business record.[13] Among other

13. At a side bar discussion of Ellerman's objections to the proffered report or to the reading of excerpts therefrom the Trial Court ruled:

"I am going to permit him [Hagans] to introduce the reference to Hold No. 4 and the reference here to sand at the conclusion of the report as a business record. Now that is all, however, I am not going to allow the whole report to go in, except for those two references."

The references are contained in the following examination:

By Mr. Borowsky: [Counsel for Hagans]

"Q. Before the unloading operation began did you have someone go aboard, that is, did your company have someone go aboard to look at the cargo?

"A. Yes, there was a survey made for the owners.

"Q. Do you have a copy of that survey?

"A. I do."
* * * * *
"Q. Mr. Nickerson, will you refer to your survey report and I would like you to look at the portion of the report that has to do with the No. 4 lower hold. It is found on page 3.

"A. Yes.

"Q. Now, will you tell us what that report shows about the condition of the sand, and I take it this is at the time of (230) the arrival of the vessel, is that correct?

"A. Correct."

* * * * *
"Q. No. 4 lower hold.

"A. You want me to read the excerpt here?

"Q. Yes.

"A. Bags Zircon sand stowed solid from floor up to approximate height of 15 feet and extending from the forward bulkhead aft approximately three-quarters the length of the hatch square. Immediately abaft the bags sand were bales of wool for Philadelphia. Discharge stowed solid to the after bulkhead.

"Q. Go on, please.

"A. We noted a quantity of loose sand and pieces of dunnage over the surface of the stow of bags of sand in way of the hatch square and a number of bags were torn. Ascertained that bagged sand discharged previously at New York had been stowed over the Philadelphia sand.

"Q. Now, the bags of sand that were previously discharged in New York are indicated in that cargo stowage plan by the arrow which you drew to that particular area, is that correct?

"A. Yes.

"Q. Now I draw your attention to the conclusion of this survey report starting at the end of Page 3 dealing with sand, various marks and ask you to read that, please.

"A. Sand hatches Nos. 1, 2, 4 and 5 lower hold and three deep tanks. Quite a large number of bags weighing approximately 112 pounds each were torn and

things the witness read from the survey that the surveyor had noted a quantity of loose sand and pieces of dunnage over the surfaces of the bags of sand comprising the cargo and that a number of the bags were torn and that he had ascertained that bagged sand previously discharged at New York had been stowed over the Philadelphia sand. The witness went on to read from the surveyor's report that the bags marked "Tazi" made of six ply paper suffered the largest percentage of tearing compared to bags of ten ply paper and burlap bags lined with three ply paper, and that the surveyor definitely recommended the use of a stronger bag. It was shown that 4436 of the 11,000 odd bags constituting the cargo in lower hold No. 4 were marked "Tazi".

The identity of the surveyor was known to Hagans from the survey itself and from information adduced from Ellerman in the pretrial proceedings. Notwithstanding, Hagans relied upon the report, and did not call the surveyor to the stand.

Ellerman claims that prejudicial error of sufficient gravity to warrant a new trial was committed when the witness was permitted to read the comments contained in the surveyor's report.

Of course, in the absence of the surveyor his statements and qualifications could not be subjected to cross-examination. Nevertheless his pronouncements were placed before the jury on the theory that the report in which they were contained constituted a business record.

■■ The admissibility of the evidence in question as a business record is governed by the Official Records Act, 28 U.S.C.A. § 1732.[14] The only evidence concerning the antecedents of this report came from the witness Nickerson who, when asked by Hagans's counsel whether he had someone go on board to look at the cargo, replied: "Yes there was a survey made for the owners" and that he had a copy. From the statement of Ellerman's counsel that he had given a copy of the survey to Hagans's counsel it is reasonable to assume that Ellerman retained a copy of the survey in its files before it was turned over to its counsel. But no foundation was offered to qualify the document as a record kept in the ordinary course of business of Ellerman or that such surveys were systematically ordered for it. Furthermore, the very purpose of the Official Records Act is to facilitate the admission of the record itself as evidence. Here the jurors were denied the physical receipt of the record (or the copy thereof) and were permitted only to hear excerpts therefrom.

we made particularly note of these bags marked Tazi.
"Q. When you say Tazi, is that T-a-z-i?
"A. Right.
"Q. That is what I referred to as Tazi, is that correct?
"A. Yes, Tazi: * * * which suffered the largest percentage of tearing. The bags of this mark were constructed of six-ply paper bags while bags of other marks were ten-ply paper or a three-ply paper bag contained in burlap. The latter burlap bag we would estimate suffered the least percentage of tearing and with regard to the Tazi mark we would definitely recommend the use of a stronger bag."

14. 28 U.S.C.A. § 1732 in pertinent part provides as follows:
"§ 1732. Record made in regular course of business.

"[a] In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.
"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility."

It has been said that:

"* * * [T]he admissibility of evidence under the Official Records Act [28 U.S.C.A. § 1732] is not established merely because the material sought to be introduced has been taken from a business file. A foundation must be laid to establish that the memoranda sought to be introduced were made in the regular course of business. * * *" Bisno v. United States, 299 F.2d 711, 718 (9 Cir. 1961). Cert. denied 370 U.S. 952, 82 S.Ct. 1602, 8 L.Ed.2d 818 (1962).

And in the leading case of Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943) the Court, in interpreting the historic aims of that Act, said:

"* * * But 'regular course' of business must find its meaning in the inherent nature of the business in question and in the methods systematically employed for the conduct of the business as a business." 318 U.S. at 115, 63 S.Ct. at 481.

The Court also stated:

"* * * Nor is it any answer to say that Congress has provided in the Act that the various circumstances of the making of the record should affect its weight, not its admissibility. That provision comes into play only in case the other requirements of the Act are met." 318 U.S. at 114, 63 S.Ct. at 481.

See also Standard Oil Co. of Calif. v. Moore, 251 F.2d 188, 215, n. 34 (9 Cir. 1958); Masterson v. Pennsylvania R. Co., 182 F.2d 793 (3 Cir. 1950) and Gordon v. Robinson, 210 F.2d 192, 197–198 (3 Cir. 1954).

The testimony in question simply was not qualified as a business record. The comments and opinion constituted no more than hearsay and, indeed, the reference in the excerpt to the New York cargo as having been shipped atop the cargo in this suit was double hearsay. It was error to permit the witness Nickerson to read from the survey.

But was the error prejudicial to Ellerman? In considering this question the Trial Court, in its memorandum disposing of post trial motions, said:

"In his alternative motion, defendant charges the Court with error in permitting testimony where a witness was allowed to state that an expert surveyor sometime after the accident stated in his report that he would 'definitely recommend the use of a stronger bag' (NT 231). The report referred to was not admitted in evidence as a document and, of course, not permitted to go out with the jury. The notation in the report, referred to by defendant, was an isolated statement which, in the opinion of the Court, had no bearing whatever on the ultimate result. If it was error, it was completely harmless. The issue was not as to the strength of the bags but as to the manner in which the bags were stowed in the hold and the condition of the stow itself, including the seepage of sand over the bags and in the area from which they were being removed." 196 F.Supp. at 595–596.

During its deliberations the jury was prompted to address an inquiry concerning this evidence to the court. Specifically, it asked for the "Report of the Inspector of Cargo". It was reminded by the Trial Court that the "actual report itself is not one of the physical exhibits in this case."; that parts of it were read and that the jury would have to rely on its own recollection of what it contained.[15]

15. The record in this respect is as follows:
"The Court: Members of the jury, I have a note which has been delivered to me. I understand that you gave it to the Marshal and he in turn gave it to the court stenographer, who delivered it to me. It reads:
"'Report of inspector of cargo.'

"Now, I guess that you are of the opinion that that report to which reference was made in the trial was a written exhibit in this case but it was not. The evidence to be decided from that report was read into the record from the report and reference was made to the report by Mr. Borowsky in his argument to

The proffer of the surveyor's report or the excerpts therefrom raises one of those typical situations where the trial judge was confronted with a split second decision as to whether the evidence was proper for the jury. That he acted with some reluctance is indicated in the manner in which he withheld the physical document but permitted the witness to read excerpts therefrom.[16]

Elder Freeman, Hagans's earlier witness, a longshoreman who worked in the hold, had testified as to the condition of the cargo before the unloading began. Whether the jury regarded Nickerson's testimony in such a manner as to fortify Freeman's testimony is unknown. Whether the jury was influenced by the recommendation of the surveyor as to the use of stronger bags is likewise unknown. However, the request makes it clear that the jury was impressed by the testimony that should not have been before it in the form in which it was admitted.

We cannot treat the admission of the challenged evidence as harmless error. Apparently the Trial Court viewed the report only as it reflected the opinion of-

fered by the surveyor therein that stronger bags should be used. We believe that all of this evidence must be considered in context and that as a whole it carried with it potential harm substantially prejudicing Ellerman in the eyes of the jurors. We conclude that its admission was susceptible of such prejudice to Ellerman as to require a new trial.

## IV

By reason of the foregoing it is appropriate to review another contention of Ellerman which undoubtedly would be raised in a future trial. That concerns itself with the proposition that it was error to submit to the jury Interrogatory 2(b):

"Was defendant's negligence in failing to furnish a safe place to work a substantial factor in causing his injuries?"

The jury answered "Yes". Ellerman argues that this query should not have been posed to the jury because the doctrine of liability to furnish a safe place to work is not applicable to Hagans since Ellerman had no control over the place where Hagans was injured.[17]

---

the jury, but the actual report itself is not an exhibit and is not a part of the exhibits in this case.

"Now, that is all I can tell you. I am sorry I had to bring you down here to tell you that, but under our rules that must be done in the presence of counsel.

"I repeat again, that actual report is not one of the physical written exhibits in this case. There were parts of it that were read to you and then reference was made to it later during argument, so that you will have to rely on your own recollection of what it contained."

16. In declining Hagans's counsel's request to reread the excerpts to the jury the Trial Judge further manifested his qualms when he commented that it was "pretty much hearsay evidence any way" and that he was "not too sure that it should have gone in to start with."

17. The Trial Judge charged the jury on the doctrine of failure to furnish a reasonably safe place to work as follows:
"In addition to the obligation of the shipowner to provide a safe and sea-

worthy vessel equipped and furnished with safe and seaworthy appliances and cargo which is stowed in a seaworthy manner, the shipowner has a nondelegable duty to provide the longshoremen engaged in the service of the ship with a reasonably safe place to work. So that now we are into another phase of what the law requires of the shipowner.

"By a non-delegable duty is meant one which cannot be shifted to anyone else by contract or otherwise. Thus, the shipowner is not relieved of this responsibility (374) (29) by reason of the fact that the longshoremen are in the employ of a stevedoring company. For all intents and purposes the longshoreman is working for the ship, and even though there is a concurrent responsibility on the part of the stevedoring company to provide its employees with a safe place to work, that does not relieve the shipowner of its own obligation toward the longshoreman to do likewise.

"That ties in with what I told you before, that generally speaking under the

The Trial Court took another view. In its memorandum it said:

"*Defendant next argues that all that it is required to do is to furnish a reasonably safe place for plaintiff to work.* As we have previously stated, Hagans was, as found by the jury, in the ship's service, the place where he was working was unsafe because of a condition caused by the ship itself, and, therefore, the ship is as liable as though Hagans had slipped on the deck itself. Furthermore, there was convincing evidence in this case that the manner of discharging the cargo was improper. That in itself could create and did create an unsafe place to work. Beard v. Ellerman Lines, Ltd., 3 Cir., 1961, 289 F.2d 201." (Emphasis supplied.) 196 F.Supp. at 595.[18]

Contrary to the Trial Court's inference the record discloses that Ellerman far from conceding that it owed any duty to Hagans to furnish a safe place to work, consistently maintained the position that it owed Hagans no such duty at the location where he was injured.

West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959) involved an injury to the employee of an independent contractor while on board a vessel which was in complete control of

maritime law longshoremen and seamen are treated practically alike.

"The obligation to provide a reasonably safe place to work is based upon the exercise of reasonable care. Now, you remember when we are talking about a safe place to work here we are talking about the place where Mr. Hagans was working.

"If the shipowner, by the exercise of reasonable care, could have prevented the condition which caused the plaintiff to be injured but failed to exercise such care, and by reason of that failure the plaintiff was injured, you would be justified in finding that the defendant was negligent. In this connection you have a right to consider whether the handling of the torn bags of sand under all the circumstances of this case was reasonably safe and proper.

"Now we are back to reasonableness again. So (375) (30) that you will note as these things go on, these various points of liability, the question of reasonableness occurs, and what is reasonable under the circumstances that you should have under consideration.

"If you should conclude that the defendant was responsible upon either the grounds of unseaworthiness or negligence, either or both, and that such unseaworthiness or negligence was a substantial factor in causing the plaintiff to be injured, then you should award to the plaintiff all of the damages which he suffered as a consequence.

"I am going to repeat a part of that. You will note that that requires that you must first find that either the ship was unseaworthy, based on the definitions which I have given you, or that there was negligence on the part of the shipowner.

If you do find that, then in addition you must find that those factors, either one or both, were a substantial factor in the resulting injury which Mr. Hagans sustained when he was removing the bags from the truck inside the pier."

18. We do not agree that Beard v. Ellerman Lines, Ltd., 289 F.2d 201 (3 Cir. 1961), reversed sub nom. Atlantic & Gulf Stevedores Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962) provides authority for the holding that improper discharge of the cargo created an unsafe place to work. Failure to provide a safe place to work and improper discharge of cargo are distinct acts of negligence as recognized in Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., supra, 369 U.S. at 364, 82 S.Ct. at 786, where the Court said:

"* * * The Court of Appeals said that the case of the respondents' negligence was established because

"'* * * the record affords ample basis for a jury fact-finding that (1) use of the bale hook method in the discharge of the burlap bales constituted negligence, and (2) that the injured longshoreman was not afforded a safe place to work.' 289 F.2d p. 207.

"So far as we know the jury may have found respondents liable not on either of those two grounds * * *."

The failure of the Trial Court to note the distinction is manifest in that portion of its charge quoted in note 17, supra. Furthermore, no interrogatory was submitted to the jury on negligence other than as it concerned the duty of furnishing a safe place to work posed in Interrogatory 2(b).

his employer in drydock, being overhauled to make it seaworthy. The employee was struck and injured by a loosely fitted end plug propelled through the top of an open cylinder in which he was working, from a one inch pipe in a water system. It was alleged that the plug was forced off when another employee of the contractor turned the water on without warning. After disposing of the unseaworthiness issue the Court said:

"In presenting his alternative ground of recovery, the petitioner has a dual theory. He first says that the duty to furnish a safe place to work is a nondelegable duty, the violation of which does not depend on fault. If unsuccessful in this position, he insists that respondent's failure to keep the water plug tight was negligence.

"Other than the doctrine of seaworthiness, whose nonrelevancy to this case we have set forth, our decisions establish no basis of liability apart from fault. Of course, one aspect of the shipowner's duty to refrain from negligent conduct is embodied in his duty to exercise reasonable care to furnish a safe place to work. But we do not believe that such a duty was owed under the circumstances of this case. Petitioner overlooks that here the respondent had no control over the vessels, or power either to supervise or to control the repair work in which petitioner was engaged. We believe this to be decisive against both aspects of plaintiff's dual theory. * * *"
(Footnote omitted.) 361 U.S. at 122–123, 80 S.Ct. at 192–193.

In the case at bar the pier where Hagans's injury occurred was owned by the United States and leased to Philadelphia Piers, Inc., not a party to this action. There is no evidence that Ellerman had any right to control the pier, its operation, or the unloading inside the pier of the cargo, or that it in fact attempted to do so.

Ellerman had no more control of the pier where Hagans's injury actually occurred than did the defendant over the vessel in West v. United States, supra. It is not chargeable with the nondelegable duty of furnishing a safe place to work in a location over which it had no control or right of control. On the other hand there is a question for the jury as to whether Ellerman was liable, under general negligence concepts, for permitting a dangerous condition emanating from the vessel to arise at the place where Hagans was injured even though it lacked control or right of control over that place. An interrogatory propounding that question could properly be submitted to the jury but the contention that Interrogatory 2(b) should not have been posed, is correct.[18a]

### V

We now turn to the appeal of Atlantic from the denial of its post trial motion for judgment N.O.V. or for a new trial.

Atlantic first argues much the same as Ellerman, that Hagans is not entitled to the warranty of seaworthiness, relying particularly on Swanson v. Marra Bros., Inc., 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045 (1946) as authority for the position that where there are "land based and non-maritime injuries, it is left for the local law to determine rights, duties and remedies." However, Swanson turns on no more than the narrow issue that as between a longshoreman, (injured by a life raft which fell from the vessel on him while he was engaged on the pier in unloading the vessel) and his employer, there is no right of recovery under the Jones Act, 46 U.S.C. § 688. Here Hagans sought no relief against his employer, Atlantic, but only against Ellerman, as one engaged in the service of the ship

---

18a. We find no inconsistency with this holding and the pronouncement of the Supreme Court on the liability of a vessel for the absolute and nondelegable duty of care owed a longshoreman on a pier over which it was without control in Gutierrez v. Waterman S.S. Corp., supra note 5, decided after the preparation but before the filing of this opinion.

entitled to the protection of the warranty of seaworthiness on the same basis as a crew member. Such relief flows from Seas Shipping Co. v. Sieracki, supra.

Atlantic also points to McKnight v. N. M. Paterson & Sons, Limited, 181 F.Supp. 434 (N.D.Ohio 1960) aff'd 286 F.2d 250 (6 Cir. 1960), cert. denied 368 U.S. 913, 82 S.Ct. 189, 7 L.Ed.2d 130 (1961), in which McKnight, a longshoreman, was injured in the hold of a vessel unloading rolls of newsprint with the use of a crane which was located on shore and owned by an independent stevedoring contractor. Atlantic submits that McKnight was "denied the warranty of seaworthiness." In this it was mistaken, for on appeal it was said specifically that: "[h]e [McKnight] was doing 'ship's service' work as an employee of an independent contractor and was entitled to the same protection against unseaworthiness which members of the ship's crew would enjoy." 286 F.2d at 251.

The Trial Court found that the undisputed evidence disclosed that "[t]he crane never became physically attached to the ship in any manner, nor did it at any time during the unloading process touch any part of the vessel." 181 F. Supp. at 439. It concluded that, as a matter of law, the injury was not caused by any unseaworthiness of the vessel or by any negligence on the part of its owner or crew. Apparently while the warranty of seaworthiness was accorded McKnight, the charge of unseaworthiness was found to have lacked proof. In the instant case Hagans, too, is entitled to the protection of seaworthiness, but it is for the jury to say whether the stowage was improper, and, if so, whether it caused the vessel to become unseaworthy.

What otherwise has been said in answer to Ellerman's claims applies equally to the arguments of Atlantic.

 Atlantic next urges that inasmuch as Hagans's injuries occurred on land his sole right to recovery is limited to action for compensation against his employer under the local workmen's compensation law. Atlantic submits, first, that Hagans applied for and received such benefits under the state law and is not permitted to seek payment for the claimed injuries from any source to whom his employer will be potentially liable by way of indemnity.[18b] Similar contentions were urged on the Trial Court and induced the following comment in its post trial memorandum:

"The third-party defendant further argues that the relationship between it and plaintiff is bound by the Pennsylvania Workmen's Compensation Act, 77 P.S. § 1 et seq., which limits its obligations to the amount payable by the stevedoring company, Atlantic. But under the facts of this case they are clearly governed by Ryan Stevedoring Company v. Pan-Atlantic S.S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133. In this regard, an interrogatory was submitted to the jury as follows:

"'[6] (a) Do you find that the Atlantic & Gulf Stevedores, Inc., performed their services in connection with the discharge of the ship's cargo in a reasonably safe and workmanlike manner?

"'[6] (b) If your answer is no, was their failure to perform the work in a reasonably safe and workmanlike manner a substantial factor in causing the plaintiff's injuries?'

The jury answered (a) 'no' and (b) 'yes.' The obligation of indemnity is maritime in nature and state law is inapplicable. * * *" 196 F. Supp. at 597.

Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., supra, cited by the Trial Court, refutes Atlantic's claim. In that case a longshoreman was involved who had received compensation from his stevedore employer under the Longshoremen's and Harbor Workers' Compensation Act and

---

18b. Atlantic's reliance on Magnolia Petroleum Co. v. Hunt, 320 U.S. 430, 64 S.Ct. 208, 88 L.Ed. 149 (1943) for this proposal is misplaced.

then had sued the shipowner for breach of the warranty of seaworthiness and for negligence. The Court permitted the longshoreman's suit against the shipowner. It also permitted the shipowner to claim indemnity from the stevedore employer. In answering a contention similar to Atlantic's the Court said:

" * * * Petitioner's [stevedore-employer] argument is based upon the following provision in the Longshoremen's and Harbor Workers' Compensation Act:

" 'Sec. 5. *The liability of an employer* prescribed in section 4 [for compensation] *shall be exclusive and in place of all other liability of such employer to the employee,* his legal representative, husband or wife, parents, dependents, next of kin, *and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death,* except that if an employer fails to secure payment of compensation as required by this Act, an injured employee, or his legal representative in case death results from the injury, may elect to claim compensation under this Act, or to maintain an action at law or in admiralty for damages on account of such injury or death * * *.' (Emphasis supplied.) 44 Stat. 1426, 33 U.S.C. § 905.

"The obvious purpose of this provision is to make the statutory liability of an employer to contribute to its employee's compensation the exclusive liability of *such employer to its employee, or to anyone* claiming under or through such employee, *on account of his injury or death arising out of that employment.* In return, the employee, and those claiming under or through him, are given a substantial *quid pro quo* in the form of an assured compensation, regardless of fault, as a substitute for their excluded claims. On the other hand, the Act prescribes no *quid pro quo* for a shipowner that is compelled to pay a judgment obtained against it for the full amount of a longshoreman's damages.

"Section 5 of the Act expressly excludes the liability of the employer 'to the employee,' or others, entitled to recover 'on account of such [employee's] injury or death.' Therefore, in the instant case, it excludes the liability of the stevedoring contractor to its longshoreman, and to his kin, for damages on account of the longshoreman's injuries. At the same time, however, § 5 expressly preserves to each employee a right to recover damages against third persons. It thus preserves the right, which Palazzolo [stevedore-employee] has exercised, to recover damages from the shipowner in the present case. * * * Petitioner's agreement in the instant case amounts to * * * a contractual undertaking to stow the cargo 'with reasonable safety' and thus to save the shipowner harmless from petitioner's failure to do so."

\* \* \* \* \* \*

" * * * [L]iability for breach of contract accrues to a shipowner against a stevedoring contractor in any instance when the latter's improper stowage of cargo causes an injury on shipboard to some one other than one of its employees. The coincidence that the loading contractor here happens to be the employer of the injured longshoreman makes no difference in principle. While the Compensation Act protects a stevedoring contractor from actions brought against it by its employee on account of the contractor's tortious conduct causing injury to the employee, the contractor has no logical ground for relief from the full consequences of its independent contractual obligation, voluntarily assumed to the shipowner, to load the cargo properly. See American Stevedores v. Porello, 330 U.S. 446

[67 S.Ct. 847, 91 L.Ed. 1011]; Crawford v. Pope & Talbot, [3 Cir.] 206 F.2d 784, 792–793; Brown v. American-Hawaiian S.S. Co., [3 Cir.] 211 F.2d 16; Rich v. United States, [2 Cir.] 177 F.2d 688; United States v. Arrow Stevedoring Co., [9 Cir.] 175 F.2d 329.

"The shipowner's action here is not founded upon a tort or upon any duty which the stevedoring contractor owes to its employee. The third-party complaint is grounded upon the contractor's breach of its purely consensual obligation *owing to the shipowner* to stow the cargo in a reasonably safe manner. Accordingly, the shipowner's action for indemnity on that basis is not barred by the Compensation Act." (Footnotes omitted.) 350 U.S. at 128–132, 76 S.Ct. at 235–236.

That in this case Hagans was a beneficiary under the Pennsylvania Workmen's Compensation Act, and in Ryan the Longshoremen's and Harbor Workers' Compensation Act was invoked, does not alter the application of the decision in Ryan. The important consideration is that Ellerman's claim against Atlantic is founded upon a contractual relationship in which Atlantic gave Ellerman a warranty to discharge the cargo in a reasonably safe manner. It is not grounded on

any claim for contribution based upon tort or upon any duty which Atlantic owed Hagans.[19]

Atlantic further argues, in effect, that stripped of its maritime nature, Hagans's claim against Ellerman is aborted by § 203 of the Pennsylvania Compensation Act of 1915.[20] It implies that by the force of this section Ellerman is entitled to the status of a statutory employer and is thus excluded from any liability other than that permitted under the Pennsylvania Workmen's Compensation Act. Atlantic reasons that since Hagans had recovered a workmen's compensation award against it he may not look to Ellerman for damages and, of course, if Hagans has no right of recovery against Ellerman there is no ground for a claim by the latter for indemnity against Atlantic.[21]

This contention suffers from the disability that it is being raised here for the first time. In any event its basic premise is incorrect for Hagans's claim is maritime in nature. Since Hagans was injured ashore, the workmen's compensation to which he is entitled is governed by the Pennsylvania Workmen's Compensation statute, but this is not to say that it can bar him, a longshoreman in the service of the ship, from his right to seek a recovery from the vessel, based upon unseaworthiness. A

19. In the recent case of Weyerhaeuser Steamship Co. v. United States, 372 U.S. 597, 83 S.Ct. 926, 10 L.Ed.2d 1 (1963), the Court gave emphasis to the principle laid down in Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 74 S.Ct. 232, 100 L.Ed. 133 (1956), stating:

"* * * The Court's decision in Ryan was based upon the existence of a contractual relationship between the shipowner and the employer. In a series of subsequent cases, the same result was reached, although the contractual relationship was considerably more attenuated. Weyerhaeuser S.S. Co. v. Nacirema, [Operating] Co., 335 U.S. 563, 78 S. Ct. 438, 2 L.Ed.2d 491; Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413; Waterman S.S. Corp. v. Dugan & McNamara, 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169."

20. "An employer who permits the entry upon the premises occupied by him or under his control of a laborer or an assistant hired by an employe or contractor, for the performance upon such premises of a part of the employer's regular business entrusted to such employe or contractor, shall be liable to such laborer or assistant in the same manner and to the same extent as to his own employe." 77 P.S. § 52.

21. For this Atlantic relies upon Frankel v. International Scrap Iron & Metal Co., 157 F.Supp. 709 (E.D.Pa.1957); Winters v. Herdt, 400 Pa. 452, 162 A.2d 392 (1960) and American Export Lines, Inc. v. Revel, 266 F.2d 82 (4 Cir. 1959). We fail to see how these cases support Atlantic's contention.

state legislature cannot ordinarily contravene the right granted a maritime employee in an area which is exclusively within the federal jurisdiction. Southern Pacific Co. v. Jensen, 244 U.S. 205, 215–216, 37 S.Ct. 524, 61 L.Ed. 1086 (1917). While it may affect, alter or modify maritime law in limited areas, this is not one of those areas, particularly in the light of the Supreme Court's recent decisions affording longshormen the protection of the absolute liability imposed upon ship owners for unseaworthiness. National uniformity dictates that the protection afforded by this maritime doctrine is not one which should be subject to variation with the particular state jurisdiction in which the injury occurs.

We are not persuaded that the Trial Court erred in submitting Interrogatories 6(a) and 6(b) to the jury. Atlantic's appeal, based on arguments that the remedy of the Pennsylvania Workmen's Compensation Act excludes Hagans from recovery against Ellerman and thus that Ellerman may not claim indemnity against Atlantic, is without merit.

### VI

Finally, Atlantic claims that it is entitled to a new trial on the ground that it was denied due process when the Trial Court refused to permit it to cross-examine Hagans's witnesses.

Atlantic does not challenge the determination as such, of the Trial Court, refusing to sever the trial of the issues in the main case between Hagans and Ellerman from those in the third-party action between Ellerman and it. Atlantic contends, however, that when this ruling was coupled with the refusal to permit it to cross-examine the plaintiff's witnesses, that refusal was error, and the denial of the severance was an abuse of discretion.

In a pretrial conference in chambers Hagans moved to exclude Atlantic from participation in the trial of the main case and in particular from cross-examining his witnesses. The Trial Court indicated it would grant this motion and Atlantic moved for a severance. The severance was denied with the third-party defendant still to be excluded from cross-examination.[22] At the beginning of the second day of the trial the following took place at the side bar:

"Mr. Marshall [Atlantic's counsel]: If Your Honor please, yesterday in chambers we raised the question as to the propriety of any questioning by the third-party defendant, and it was then stated by Mr. Borowsky [Hagans's counsel] that he would object to any questioning by counsel for Atlantic & Gulf. Now, Your Honor in chambers, as I understand it, agreed with that position and indicated that we would make this clear on the record. So that I don't have to interrupt after each witness, I would like to have the record show that counsel for third-party defendant will not cross-examine any of plaintiff's witnesses either on the liability issue or on medical damages, pursuant to that Court ruling, but that we do not assent to it, that it is done over our objection.

"The Court: That is agreeable. And do you want to get your motion to sever on the record?

"Mr. Marshall: Yes. I would like also to have the record show that following that decision by Your Honorable Court I then made a motion for the severance of the shipowner's case against the third-party defendant, and of course Your Honor overruled (74) that motion.

"The Court: We will grant you a general exception on both of those points. However, it is not beyond the realm of imagination that something could come up in the case which would possibly give you the right to cross-examine. As I say, on the pleadings I don't anticipate

22. Toward the end of Hagans's case he introduced an expert witness whom Atlantic was permitted to cross-examine.

that will happen, and from Mr. Borowsky's opening to the jury I don't anticipate that will happen, but if something very unusual should occur as to which you felt the rights of your client were prejudiced, I think you better bring it to my attention.

"Mr. Marshall: I will bring that to Your Honor's attention.

"I think in fairness to my client also the jury should—well, Mr. Borowsky did advise them, but I think it would be more proper if Your Honor mentioned to the jury that the case is between plaintiff and defendant here, so that they won't think I am just showing a total lack of interest in not cross-examining. They could get an impression that I am just sitting here like a bump on a log not caring what happens which isn't the case at all. Would Your Honor care to make such a statement?"

There being no objection the Trial Court addressed the jury as follows:

"Members of the jury, counsel has very properly called something to my attention, and they feel, as I do, that the jury should be fully aware of the nature of the case you are trying. Therefore, I will advise you as follows. You recall that when Mr. Borowsky opened he made it very plain that this was in effect two cases in one. He sought liability and damages from the ship, the original defendant represented by Mr. Alspach. He wasn't interested in the action between Mr. Alspach and the stevedoring firm represented by Mr. Marshall. Now, during the course of the trial under our rules Mr. Marshall is limited as to his right to cross-examine witnesses, because there is no adversity between Mr. Marshall's client, the stevedore, and the original plaintiff represented by Mr. Borowsky. Therefore, under our rules he cannot cross-examine Mr. Borowsky's witnesses.

"I just mention that to you so that you won't think that Mr. Marshall isn't diligent, isn't doing his job, or that he is not interested in what goes on in the case. If you note that he is not taking an active part, it is because (76) he is precluded by law from doing so.

"You will hear more on this as the case progresses, but at this time I just want to make that statement to you, to which counsel have agreed, that Mr. Marshall is precluded, except under most unusual circumstances, from cross-examining the witnesses. But that is no indication that he is not vitally interested in the case."

Atlantic submits that Hagans's fact witnesses were permitted to give testimony on direct examination as to the unloading operation as performed by the stevedores and facts relating to the accident, and that it should have been permitted cross-examination on that score. Ellerman on its cross-examination, elicited testimony from which it could be inferred that the stevedores could have alleviated the hazardous condition Hagans sought to show. Particularizing its complaint Atlantic alleges that it should have been permitted to cross-examine Hagans and its (Atlantic's) other employees, Houston, Crocker and Freeman, who testified for Hagans and from whom Ellerman on cross-examination had adduced information relating to the use of slings, attempts to clean up the sand, the practice of bringing brooms and shovels to a job, the personnel supervising the unloading, and other facts of a similar nature intended to demonstrate that Atlantic was at fault.

Atlantic recognizes the propriety of Ellerman's cross-examination in the light of the consolidation of the actions and that the witnesses only would be called once. It argues that the prejudice to it is patent when it is observed that the Trial Court, in its charge, instructed the jury that in determining the liability of Atlantic to Ellerman it should consider

the testimony elicited in the main case.[23] Atlantic insists such testimony could only be admitted against it after an opportunity had been afforded to probe the witnesses in its own way and from its own knowledge of the facts.

Hagans justifies his objection to Atlantic's participation in the trial of his case against Ellerman on the ground that Atlantic had not filed an answer to his complaint pursuant to Federal Rule of Civil Procedure 14(a)[24] and it did not raise any issue adverse to Hagans in its answer to the third party complaint of Ellerman. Hagans took the position that he had no claim and could make no recovery directly from Atlantic and under such circumstances it would be unjust and prejudicial to him if Atlantic were permitted to participate in the trial between him and Ellerman as if it were a co-defendant. Absent any pleading filed by Atlantic against his complaint, Hagans submits that he would not be alerted to Atlantic's defenses and would be deprived of the opportunity to undertake discovery proceedings against it. Hagans further urged that unless he was afforded protection he would find himself confronted with two hostile parties although only one appears of record against him. Hagans relied on Kestner v. Reading Co., 21 F.R.D. 303 (E.D.Pa. 1957) and M.V.M., Inc. v. St. Paul Fire & Marine Insurance Co., 20 F.R.D. 296 (S.D.N.Y.1957).

Ellerman does not contest Atlantic's position in this respect believing it to be correct. It did urge, however, that should Atlantic be granted a new trial it also should be awarded similar relief in the original action against it by Hagans.[25]

This controversy was also aired to the Trial Court who disposed of it in his post trial memorandum thus:

"At the beginning of the trial, plaintiff asked the Court to rule that the third-party defendant Atlantic be precluded from cross-examining his witnesses. Atlantic had not filed an answer to the original complaint

---

23. The following is found in the Trial Court's Charge:

"* * * But if you should find in favor of the plaintiff, then, of course, you would determine whether or not there is liability from the longshoreman to the original defendant, the shipowner, and there you would apply the ordinary rules of negligence. * * *"

"Now, the interesting thing there is that of course Mr. Hagans has a right and does bring his action against a shipowner and the shipowner is responsible to Mr. Hagans, but if in your deliberations you should find that the shipowner is liable, then if that liability was created by the negligence or the failure to perform its work in a proper workmanlike manner, if you should find the stevedores themselves created that situation, then, of course, you would find in favor of the shipowner against the third party defendant. * * *"

"* * * [I]f you find anything in this evidence that indicates to you that these longshoremen, either the supervisors or the gang (389) (44) bosses or the hatch foremen, or whoever they may have been, as agents of the stevedores, or the stevedores in a group, or in any way, shape, or form, if they didn't do their work in a proper workmanlike manner and in

failing to do so that resulted in liability from this shipowner to Mr. Hagans, then, of course, the shipowner would be entitled to recover against them."

At the end of the charge the following ensued:

"Mr. Alspach [Counsel for Ellerman]: If Your Honor, please, I would ask Your Honor to charge the jury that in the action as between the defendant whom I represent and Atlantic & Gulf, the jury is entitled to take into consideration all of the (395) (50) evidence in the case, there having been no severance of the actions here."

Atlantic took exception to the foregoing requests and the granting thereof.

24. The pertinent portion is:

"* * * The third-party defendant may assert against the plaintiff any defenses which the third-party plaintiff has to the plaintiff's claim. The third-party defendant may also assert any claim against the plaintiff arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff. * * *" Federal Rule of Civil Procedure 14(a).

25. Further consideration of this proposal need not be undertaken since such relief has been granted.

and was not an adverse party to plaintiff on the record, although, admittedly, there did appear during the trial some adversity as to the facts which later developed. We ruled in favor of the plaintiff on that point, but informed counsel that we would listen carefully to the testimony and that if at any stage during the trial any witness called by the plaintiff in our opinion stated facts which were prejudicial to the third-party defendant, we would allow cross-examination or if, on the other hand, counsel for the defendant failed to fully cross-examine, we would permit the third-party defendant to do so. We have reexamined the record and cannot find that on the basis of the testimony of all the witnesses for plaintiff, except one, that the third-party defendant was prejudiced by our ruling. As to that one witness, who was an expert called to testify on the proper or improper method of unloading broken bags of sand, the third-party defendant was given full opportunity of cross-examination. We gather from the third-party defendant's brief and argument that he does not question our ruling so much on the testimony elicited from the plaintiff's witnesses on direct-examination but the inferences arising from the original defendant's questions on cross-examination. We are unable to agree with him on this point. A careful review of the record does not disclose to us anything which he could have raised on cross-examination which would have enhanced his position in the slightest degree. He overlooks the prejudice to plaintiff of repetitive cross-examination and the general principle that 'the district judge has a wide discretion in regulating trial procedure.' Walker v. Loop Fish & Oyster Co., 5 Cir., 1954, 211 F.2d 777, 781. Were we convinced in the slightest degree that the failure to cross-examine the witnesses other than the expert

prejudiced the position of the third-party defendant, we would readily grant a new trial, but such is not the case." 196 F.Supp. at 596–597.

Regretfully we cannot join in the Trial Court's disposition of the question raised by Atlantic.

 The denial of the motion to sever the actions was, of course, within his sound discretion dictated undoubtedly by concern for the convenience and economy of time of all involved in the litigation. But such concern should not override considerations of prejudice which may result from foreclosure of cross-examination. That right is fundamental, limited only by the well defined restraints to curb its abuse. Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931); United States v. 3.544 Acres of Land, etc., 147 F.2d 596, 601 (3 Cir. 1945) and McGraw-Edison Co. v. Central Transformer Corp., 308 F.2d 70, 74 (8 Cir. 1962).

It appears that the Trial Court took the view that before the trial Atlantic was not an adverse party to Hagans on the record and therefore not entitled to cross-examine Hagans's witnesses. Of course there was no occasion for Atlantic to file an answer to Hagans's complaint which contained no direct demand upon it. Nevertheless the factual adversity between them is apparent from Ellerman's third-party complaint in which it is alleged that if Hagans sustained injuries by reason of any negligence or an unseaworthy condition, such negligence or unseaworthiness was caused by Atlantic. Atlantic answered with a formal denial.

 The testimony brought out of Hagans's witnesses, heightened by Ellerman's cross-examination, was by the very instruction of the Trial Court made the basis from which the jury was to determine whether Atlantic was liable to Ellerman. We cannot agree that Atlantic may be deprived of its right to cross-examine the witnesses from whose lips it was inculpated. Repetitive cross-examination such as concerned the Trial Court

and Hagans, as subjecting him to hazard, or any other improper questions were susceptible to objection and rapid dispatch by the Trial Court. The hazards to Hagans clearly weigh less than the prejudices which the complete deprivation may have caused Atlantic to suffer. Nor have we overlooked the care with which the competent and experienced Trial Judge screened the testimony during the course of the trial to determine whether without cross-examination Atlantic's position was prejudiced by their evidence. That form of judicial supervision may not be substituted for the sharp instrument of cross-examination intelligently wielded by the hands of the advocate of the party affected by testimony involving it.

The arguments and authorities Hagans made and cited here were earlier propounded by the same counsel in Weitort v. A. H. Bull & Company, 192 F.Supp. 165 (E.D.Pa.1961) and were met by the court when it stated:

"As to plaintiff's complaint that he could not have directed any interrogatories to third-party defendant, counsel for plaintiff apparently overlooks the language underlined below in Kestner v. Reading Company, D.C.E.D.Pa.1957, 21 F.R.D. 303–304:

"'* * * it has been held that the rule refers not to parties whose interest in the result of the litigation may be adverse but to parties who are on opposite sides of an issue raised by the pleadings or *otherwise presented by the* record.' (Emphasis supplied.) [5]

"5. See Mozeika v. Kaufman Construction Company, D.C.E.D.Pa.1960, 25 F.R.D. 233, reaffirming the Kestner case.

"This record makes clear that third-party defendant and plaintiff are adverse on the issue of the allegation of faulty brakes on the payloader, which was brought on the ship by third-party defendant, even though third-party defendant did not answer the Complaint. Under the Kestner case, it seems clear that plaintiff could have directed interrogatories to Jarka concerning this issue.

\* \* \* \* \*

"The fact that Jarka [third-party defendant] will have the opportunity to cross-examine plaintiff's witnesses is no source of prejudice as the court can control repetitive cross-examination. If such additional cross-examination elicits the truth, it results in 'the doing of justice.'

\* \* \* \* \* \*

"Plaintiff bases this contention on language in cases such as M.V.M., Inc. v. St. Paul Fire & Marine Insurance Co., D.C.S.D.N.Y.1957, 20 F.R.D. 296,[7] which considers wheth-

"7. This case recognizes at page 298 that there is a previous decision of the Southern District of New York which is in accord with the language underlined above from the Kastner [sic] case on the issue of when these interrogatories may be filed between parties who have not filed any pleadings directed to each other. See McAllister Lighterage Line, Inc. v. Oil Barge Vejoil, 13 F.R.Serv. 33.21, Case 1, at page 589. Cf. 4 Moore's Federal Practice (2nd Ed.), par. 33.06.

er a plaintiff and third-party defendant are adverse for the purpose of the application of F.R.Civ.P. 33, which provides that 'Any party may serve upon any *adverse* party written interrogatories \* \* \*' (emphasis supplied). Such decisions are inapplicable to the factual situation presented by this record.[8]" 192

"8. See Cooper v. D/S A/S Progress, D.C. E.D.Pa.1960, 188 F.Supp. 578, 582–583. The pre-trial judge has explained in that opinion why he believes the emphasis placed by counsel for plaintiff on the wording of a form attached to the Rules is not pertinent on the issue presented by this Motion."

F.Supp. at 168–169.

We conclude that Atlantic is entitled to a new trial on Ellerman's third-party complaint against it for indemnity by reason of the denial of the right to cross-

examine Hagans's witnesses in the consolidated trial.

### VII

To summarize, there will be a new trial as to Ellerman to determine its liability and damages to Hagans, if any, excluding, however, the issue of liability based upon the non-delegable duty of providing a safe place in which to work.

As concluded above, there also will be a new trial on Ellerman's third-party complaint against Atlantic for indemnity.

Hence, the judgment of the District Court of March 22, 1961 will be vacated and the cause remanded with directions to proceed in accordance with this opinion.